[No. 40006-5-II.   Division Two.   March 20, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. DAMIEN DARNELL HARRIS, *Appellant*.

*Damien Darnell Harris*, pro se.

*Patricia A. Pethick*, for appellant.

*Jon Tunheim, Prosecuting Attorney*, and *Scott M. Jackson, Deputy*, for respondent.

¶1 JOHANSON, J. — After a bench trial, the trial court found Damien Harris guilty of leading organized crime, two counts of unlawful delivery of cocaine, unlawful possession of cocaine with intent to deliver, two counts of money laundering, solicitation to commit first degree murder, and maintaining a building or dwelling for drug purposes. The trial court imposed an exceptional 609-month sentence. Harris's appeal raises numerous challenges to evidentiary rulings, his convictions, and his sentence. In the published portion of our opinion, we address the double jeopardy issue. In the unpublished portion, we address the veracity

of an affidavit and the probable cause finding for a search warrant and the numerous errors asserted in Harris's statement of additional grounds for review (SAG) and supplemental SAG.[1] We affirm the trial court's order denying the suppression of evidence and affirm Harris's convictions and sentence.

## FACTS

### BACKGROUND[2]

¶2 In March 2008, the Thurston County Narcotics Task Force (Task Force) began investigating Damien Harris. Detectives Ken Lundquist and Randy Hedin-Baughn coordinated with confidential informant Dale "Cyrus/Syrus" Shipman to schedule a series of controlled buys of cocaine from Harris. Before an April 16 buy, Detective Lundquist searched Shipman for drugs or personal money and then provided him with $40 of prerecorded traceable funds. Detective John Hess drove Shipman to the buy location. Upon arriving at the buy location, Shipman exited the vehicle, entered Harris's vehicle, and exchanged the $40 in traceable funds for crack cocaine. Harris was his vehicle's only other occupant during the drug transaction with Shipman. After the buy, Shipman turned over the drugs to Detective Hess, and Detective Lundquist searched him again at the designated meet location.

¶3 On April 18, Shipman scheduled a second controlled buy of cocaine from Harris. Before the buy, Detective Lundquist searched Shipman and provided him with $40 of prerecorded traceable funds. Detective Hess, who was still undercover, drove Shipman to the buy location. Harris

---

[1] RAP 10.10.

[2] The background facts rely exclusively on unchallenged findings the trial court entered. The trial court entered 22 pages of findings of fact and just over 4 pages of conclusions of law. On appeal, Harris assigns error only to the factual findings from part of page 16 through part of page 19 of the trial court's written order. Accordingly, the remaining 19 pages of factual findings are verities on appeal. *See State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

arrived at the location in a car with Michael Boyer. Shipman entered Harris's vehicle; simultaneously, Steven Parra arrived and also entered Harris's vehicle. Parra purchased crack cocaine from Harris, and then Shipman purchased $40 of crack cocaine from Harris using the prerecorded funds. Shipman then returned to Detective Hess's vehicle and turned over the drugs to him; then, at the designated meet location Detective Lundquist searched him again.

¶4 Shortly thereafter police arrested Harris and Boyer. During jail booking, Boyer told officers he had hidden contraband "in his rectum." Clerk's Papers (CP) at 133. Detective Matt Renschler recovered from Boyer a plastic bag containing money, crack cocaine, and marijuana. The recovered money included the prerecorded $40 that Shipman had used during the second controlled buy. When asked if the recovered drugs belonged to Harris, Boyer responded that "he did not want to die and he was concerned for his life." CP at 133. At trial, Boyer ultimately testified that most of the recovered drugs belonged to Harris.[3]

¶5 Following Harris's arrest, police investigation efforts turned to an apartment where Harris stayed periodically. Landlord Kathy Kruse initially told Detective Lundquist that Harris stayed at the apartment "occasionally" and denied the police permission to enter it. CP at 134. Detective Lundquist returned three days later with a search warrant but did not find anything of evidentiary value. This time, though, Kruse explained that she rented Harris the same room for $20 a day, and eventually the rental agreement became "$20.00 worth of crack cocaine a day." CP at 135.

¶6 Kruse also told police about a three-person phone conversation between Kruse, Harris, and Rob Bennett that

---

[3] This recovered cocaine served as the basis for Harris's eventual charge of unlawful possession of a controlled substance with intent to deliver.

Harris initiated from jail after his arrest. During that phone conversation, Harris instructed Kruse to enter his apartment and retrieve drugs and money from a jacket in the closet. Kruse found the drugs and approximately $2,600 in the jacket pocket. Harris instructed Kruse to smoke or flush the "golf ball sized pieces of rock cocaine" down the toilet and to deliver the money to "one of his associates." CP at 135. Kruse testified at trial that Adrian Morris came to her apartment to retrieve the money and to secure Harris's other belongings. Eventually, as Harris further instructed, Kruse gave the money to Harris's girl friend, Temica Tamez. During a recorded jail phone conversation, Tamez told Harris that she "told [Kruse that Tamez] was going to beat the shit out of her" for retrieving the $2,600. CP at 135.

¶7 After talking with Kruse, Detective Lundquist began monitoring Harris's jail phone conversations. Through call monitoring, Detective Lundquist learned that Harris had reported Tamez's Olympia home as his residence to his Department of Corrections officer. Detective Lundquist obtained and executed a search warrant on Tamez's Olympia house, took pictures of clothing in a closet that suggested Harris lived there, and located a handgun in the same closet.[4]

¶8 On April 28, based on other recent jail phone conversations, Detective Lundquist filed an affidavit and application for a warrant to search Harris's safe deposit box. The affidavit outlined the two controlled buys, the subsequent searches at Kruse's building and Tamez's Olympia residence, and several jail phone calls between Harris and Tamez. Detective Lundquist included the following description of Harris's and Tamez's jail phone conversations in the probable cause statement:

---

[4] Based on various trial testimonies, the trial court ultimately found that the firearm was not operable because of the time it would take to secure and replace a missing firing pin.

Of the phone calls I have listened to, Harris instructs Tamez to go to his bank and contact "Josh" and only "Josh" to gain access to a safe deposit box and conceal items in it before law enforcement can find them.

I listened to the phone calls from April 25, 2008, at approximately 0901 hours. At this time, Harris called Tamez as Tamez was in the bank speaking with "Josh." The phone was handed to "Josh" and Damien Harris verbally authorized "Josh" to add Temica Tamez to his account and to his safe deposit box.

Harris made another phone call to Tamez at 0944 hours. During that phone call, Tamez told Harris that she had been given access to his banking accounts and the safe deposit box. It is my belief that the evidence, Task Force buy money, that was taken from Kathy Kruse's apartment on April 19, 2008, was placed in that safe deposit box to prevent law enforcement from gaining access to the buy money.

CP at 59-60.

¶9 The trial court approved a warrant to search the safe deposit box, and police executed it that same day. Police confirmed that Tamez was a signer on the safe deposit box and found $25,000 in cash in it, but the police did not find the first controlled buy funds.

¶10 After searching the safe deposit box, police continued to monitor Harris's jail calls. Based on information learned through these calls, detectives served a search warrant on Tamez's Lacey residence, and detectives recovered letters from Harris directing Tamez to claim the $25,000 in the safe deposit box as her own. Harris's letters instructed people to falsify documents and hide evidence of various crimes and sources of drug sale proceeds.

¶11 In September 2008, simultaneous to its ongoing investigation of Harris, the Task Force investigated Boyer and another Harris associate, Adrian Morris. After his release from jail, Boyer contacted Shipman to sell him more drugs and firearms. As police watched Boyer's residence in anticipation of the drug buy, they observed Morris arrive at Boyer's residence. Officers followed Morris when he left

Boyer's home and observed him make additional drug transactions. Officers executed search warrants of Morris's car and home, and Boyer's home, and they found more cocaine. Police arrested Morris and Boyer.

¶12 After his September 2008 arrest, Boyer agreed to tell the Task Force about his knowledge and involvement in a drug trafficking organization. He identified Morris and Harris as the organization's other primary participants. Boyer also revealed that Harris had asked him to kill Shipman for his role as a confidential informant. Boyer ultimately entered a plea agreement with the State to testify against Harris.

## TRIAL PROCEDURE

¶13 The State filed an amended information in Thurston County Superior Court, charging Harris with leading organized crime[5] (count I); first degree unlawful possession of a firearm[6] (count II); two counts of unlawful delivery of a controlled substance (cocaine)[7] (counts III, IV); unlawful possession of a controlled substance (cocaine) with intent to deliver[8] (count V); two counts of money laundering[9] (counts VI, VII); tampering with a witness[10] (count VIII); solicitation to commit first degree murder[11] (count IX); and maintaining a building or dwelling for drug purposes[12] (count X).

¶14 Before trial, Harris filed a pro se motion to suppress the $25,000 officers found in his safe deposit box. Harris's

---

[5] RCW 9A.82.060(1)(a).

[6] RCW 9.41.040(1)(a).

[7] RCW 69.50.401.

[8] RCW 69.50.401.

[9] RCW 9A.83.020(1).

[10] RCW 9A.72.120(1)(a).

[11] RCW 9A.32.030(1)(a); former RCW 9A.28.030 (1975).

[12] RCW 69.50.402(1)(f).

attorney subsequently filed two suppression motions and the trial court held two separate hearings to consider Harris's arguments.

¶15 At the first hearing, the trial court considered whether to authorize a full *Franks*[13] hearing; that is, the trial court considered whether Detective Lundquist had made material misrepresentations or omissions in the affidavit for the safe deposit box search warrant that merited a full evidentiary hearing on the content of the affidavit. Harris argued that Detective Lundquist misrepresented that Tamez had "access" to the safe deposit box because Lundquist knew, from an April 25, 2008 jail phone call, that Tamez did not have a key to the box, yet recklessly failed to include in his affidavit that Tamez did not have a key. Report of Proceedings (RP) (Oct. 5, 2009) at 8. The State responded that Tamez had legal access to the safe deposit box on April 25 and that she could have secured a key in the period before Detective Lundquist sought a search warrant three days later. Moreover, the State argued that Harris had not met his burden to show any omission was reckless or that Tamez's lack of a key negated the trial court's probable cause finding. The trial court found that Detective Lundquist did not make a false statement about Tamez's ability to "access" the safe deposit box or omit any material information. RP (Oct. 5, 2009) at 19. Accordingly, the trial court denied Harris a full *Franks* hearing.

¶16 At the second hearing, the trial court considered whether the trial court that authorized the search warrant had abused its discretion when finding that Detective Lundquist's affidavit established probable cause to search the safe deposit box. Harris argued that no nexus existed between the alleged crimes and the expectation of finding any relevant evidence in the safe deposit box. He argued that there were too many inferences needed for a connection between the first controlled buy and finding that buy's traceable funds in the safe deposit box.

[13] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

¶17 Based on its review of Detective Lundquist's affidavit, the trial court determined that the previous court had not abused its discretion by finding probable cause for the search warrant. The trial court relied in part on the alleged jail phone conversation in which Harris told Tamez to access the safe deposit box to conceal evidence.

¶18 Harris waived his right to a jury trial and his right to have a jury decide aggravating exceptional sentence factors. Over the course of the nine-day bench trial, the State called numerous witnesses, including Detective Lundquist, several other police officers, Shipman, Kruse (landlord), Tamez, and Boyer. Harris called three witnesses, but he opted not to testify.

¶19 Boyer testified extensively about the activities of their drug trafficking organization.[14] He grew close to Harris when they were both in jail and they discussed "doing 'business' together" when released from custody. CP at 139. Once both were out of jail, they began "associating regularly." CP at 139. Boyer met Morris through Harris and learned that Harris and Morris had been "long time friends and associates." CP at 139. Boyer testified that the three men worked together to protect their drug business's territory but that Harris was the primary provider of cocaine. Boyer further testified that Harris protected his cocaine source and that Harris received powdered cocaine and processed it into crack cocaine.

¶20 Boyer also testified about being in jail with Harris in April 2008, after the controlled buys. Harris told Boyer he wanted Shipman killed. Harris then arranged to post Boyer's bail using the money Harris had in his jacket at Kruse's apartment. Boyer also testified that Harris told him that Boyer and Morris would "have to take care of the drug customers and keep the drug enterprise going while Harris was incarcerated." CP at 140. Harris then provided

---

[14] Of particular importance to some of the issues in Harris's SAG, the trial court's written findings heavily incorporated Boyer's trial testimony.

Boyer the phone numbers for his drug sources and customers. Boyer testified that when he got out of jail, he "worked with Adrian Morris to keep the drug business going for Mr. Harris." CP at 140.

¶21 Also, after Boyer's release, Harris sent him a letter requesting that he kill Shipman in exchange for money. Boyer tried to recruit Leonard Hamilton to kill Shipman. The police never recovered Harris's letter to Boyer, but at least two other witnesses testified to reading its content. They testified that the letter requested the killing of a confidential informant named "Syrus" for $5,000. CP at 141. Harris sent Boyer other letters asking about "know-[ing] where Syrus is. . . . What's the problem[?]" and saying "man yall suppose to be staying on the low and trying to find the –.–. What is going on with that[?]" CP at 141.

¶22 The trial court issued its decision from the bench. The trial court entered extensive findings of fact and conclusions of law. The trial court found Harris guilty of leading organized crime (count I), two counts of unlawful delivery of cocaine (counts III, IV), unlawful possession of cocaine with intent to deliver (count V), two counts of money laundering (counts VI, VII), solicitation to commit first degree murder (count IX), and maintaining a building or dwelling for drug purposes (count X). The trial court entered not guilty verdicts for first degree unlawful possession of a firearm (count II) and tampering with a witness (count VIII). The trial court entered special findings that (1) Harris committed several of the offenses shortly after being released from a prior incarceration and (2) some of the offenses were major violations of the Uniform Controlled Substances Act[15] related to trafficking.

¶23 The trial court sentenced Harris and denied Harris credit for any time Harris had recently served in jail. Also, the trial court entered seven different no-contact orders for

---

[15] Ch. 69.50 RCW.

either 10 years or life terms, including lifetime prohibitions on contact with Morris, Boyer, and Shipman. Harris appeals.

## ANALYSIS

### DOUBLE JEOPARDY

¶24 Harris argues that the trial court violated his constitutional freedom from double jeopardy because in addition to entering his conviction for leading organized crime, it also entered separate convictions for the predicate offenses required to establish the crime of leading organized crime. Specifically, Harris argues that he cannot be separately convicted on two counts of unlawful delivery of a controlled substance, two counts of money laundering, and one count of solicitation to commit first degree murder because those convictions were "incidental to, a part of, or coexistent with" his conviction for leading organized crime. Br. of Appellant at 7 (all caps omitted). The State responds that double jeopardy proscriptions do not apply here because (1) the offenses charged are not the same under the "same evidence test" and (2) the legislature indicated its intent for conviction of leading organized crime to be separate and in addition to its predicate offenses. Br. of Resp't at 5. We agree with the State.

### *Three-Step Analysis*

■■ ¶25 Article I, section 9 of the Washington Constitution and the Fifth Amendment to the federal constitution protect persons from a second prosecution for the same offense and from multiple punishments for the same offense imposed in the same proceeding. *In re Pers. Restraint of Percer,* 150 Wn.2d 41, 48-49, 75 P.3d 488 (2003) (citing *State v. Gocken,* 127 Wn.2d 95, 100, 896 P.2d 1267 (1995)). Nevertheless, the legislature may constitutionally authorize multiple punishments for a single course of conduct. *State v. Calle,* 125 Wn.2d 769, 776, 888 P.2d 155 (1995)

(citing *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 1436, 63 L. Ed. 2d 715 (1980)).

¶26 To determine whether the legislature authorized multiple punishments, Washington courts use a three-step analysis. *In re Pers. Restraint of Burchfield*, 111 Wn. App. 892, 895, 46 P.3d 840 (2002). We first look for express language within the statute authorizing separate punishments. *Calle*, 125 Wn.2d at 776. Second, if the statutory language is silent, we apply the "same evidence"[16] test. Under the same evidence test, two statutory offenses are the same for double jeopardy purposes if the offenses are identical in law and in fact. *State v. Hughes*, 166 Wn.2d 675, 682, 212 P.3d 558 (2009); *Calle*, 125 Wn.2d at 777. Under the legal prong of the analysis, if each offense includes an element not included in the other and requires proof of a fact the other does not, then the statutory offenses are not constitutionally the same under this test and double jeopardy prohibitions are not violated. *Hughes*, 166 Wn.2d at 682; *Calle*, 125 Wn.2d at 777. The legal element analysis requires more than just a facial comparison of the statutory offenses' requirements. *Hughes*, 166 Wn.2d at 684. Although the "same evidence" test is a significant indicator of legislative intent, it is not dispositive. *Calle*, 125 Wn.2d at 780. Third, we discern whether the legislature has "clearly indicated its intent that the same conduct or transaction will not be punished under both statutes." *Hughes*, 166 Wn.2d at 682; *see Calle*, 125 Wn.2d at 780. This part of the analysis involves reviewing legislative history, the statutory structure, and the purpose of the statutes. *Hughes*, 166 Wn.2d at 684. Where the results of the same evidence test would allow multiple convictions to stand, only "clear evi-

---

[16] Washington's "same evidence" test is sometimes referred to as the "same elements" test or "the *Blockburger* test." *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). The federal rule is very similar to Washington's test.

dence of [a] contrary [legislative] intent" can override the same evidence test results. *Calle*, 125 Wn.2d at 780.[17]

¶27 Here, both parties agree, correctly, that the criminal statutes in question do not contain specific language authorizing separate punishments for the same conduct. Therefore, we apply the "same evidence" test, inquiring whether, as charged, each offense includes elements not included in the other and whether proof of one offense also proves the other. *Calle*, 125 Wn.2d at 777.

### A. Same Evidence Test

■ ■ ¶28 Harris argues that the offense of leading organized crime requires a "pattern of criminal profiteering activity," which means three or more predicate offenses. Br. of Appellant at 10. The State correctly responds that the elements for the offense of leading organized crime are distinguishable from those of the predicate offenses.

¶29 RCW 9A.82.060 (leading organized crime) provides:

(1) A person commits the offense of leading organized crime by:

(a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity.

Here, the element of leading "any three or more persons" is not present in any of Harris's predicate crimes[18] and is, therefore, a distinguishable element. Further, RCW 9A.82-.010(4) provides that a pattern of criminal profiteering includes

any act, including any anticipatory or completed offense, committed for financial gain . . . and punishable as a felony and by imprisonment for more than one year, regardless of whether the act is charged or indicted, as any of the following:

---

[17] *See State v. Smith*, 165 Wn. App. 296, 266 P.3d 250 (2011), *petition for review filed*, No. 86951-1 (Wash. Jan. 5, 2012).

[18] Harris's predicate crimes include solicitation to commit first degree murder, money laundering, and delivery of a controlled substance.

(a) Murder, as defined in RCW 9A.32.030 and 9A.32.050;

. . . .

(q) Delivery or manufacture of controlled substances or possession with intent to deliver or manufacture controlled substances under chapter 69.50 RCW;

. . . .

(t) Money laundering, as defined in RCW 9A.83.020.

Although RCW 9A.82.010(4) includes numerous potential predicate offenses, it also requires that the potential predicate offense be "committed for financial gain." Applying the "same evidence" test, the "leading organized crime" offense includes elements not included in Harris's predicate offenses; and mere proof of solicitation to commit first degree murder, money laundering, and delivery of a controlled substance would not have proved leading organized crime without meeting additional elements. *Calle*, 125 Wn.2d at 777.

¶30 Although the "same evidence" test is a significant indicator of legislative intent, it is not dispositive. *Calle*, 125 Wn.2d at 780. In spite of having different elements, multiple punishments may violate double jeopardy protections where the legislature intended a single punishment for a higher degree of a single crime rather than multiple punishments for several separate, lesser crimes. *See State v. Vladovic*, 99 Wn.2d 413, 419, 662 P.2d 853 (1983).

### B. Merger

¶31 Harris argues that the merger doctrine is "simply another way" to determine whether the legislature authorized multiple punishments and that the merger doctrine precludes his conviction for his predicate offenses because they were "incidental to, a part of, or coexistent with" his conviction for leading organized crime. Br. of Appellant at 11, 12 (emphasis omitted). We disagree.

¶32 The merger doctrine evaluates whether the legislature intended multiple crimes to merge into a single crime

for punishment purposes. *Vladovic*, 99 Wn.2d at 419 n.2 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Merger applies only where the State must prove an act separately defined as a crime by the criminal statutes to prove an additional crime. *Vladovic*, 99 Wn.2d at 420-21. Where the legislature has provided a statutory scheme distinguishing different degrees of a crime, we may determine that the legislature intended a single punishment for a higher degree of a single crime rather than multiple punishments for several separate, lesser crimes. *See Vladovic*, 99 Wn.2d at 419. In *Johnson* I, for example, the crimes of assault and kidnapping merged into first degree rape because these two crimes were elements necessary to prove first degree rape; additional convictions for assault and kidnapping would therefore constitute double jeopardy. *State v. Johnson*, 92 Wn.2d 671, 681, 600 P.2d 1249 (1979) (*Johnson* I), *cert. dismissed*, 446 U.S. 948 (1980); *State v. Johnson*, 96 Wn.2d 926, 936, 639 P.2d 1332 (1982), *overruled on other grounds by Calle*, 125 Wn.2d at 775.

¶33 If the evidence required to prove one crime is also necessary to prove a second crime or a higher degree of the same crime, we consider whether the facts show that the additional crime was committed incidental to the original crime. *Johnson* I, 92 Wn.2d at 680. If one crime was incidental to the commission of the other, the merger doctrine precludes additional convictions; but, if the offenses have independent purposes or effects, the court may impose separate punishment. *Vladovic*, 99 Wn.2d at 421. To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element. *Johnson* I, 92 Wn.2d at 680.

¶34 Harris specifically argues that because the element of "pattern of criminal profiteering activity" within the offense of "leading organized crime" requires underlying

predicate offenses, these predicate offenses are "incidental to, a part of, or coexistent with" his conviction for leading organized crime. Br. of Appellant at 12 (emphasis omitted). RCW 9A.82.010(12) defines the required pattern of criminal profiteering activity:

> [It] means engaging in at least three acts of criminal profiteering, one of which occurred after July 1, 1985, and the last of which occurred within five years, excluding any period of imprisonment, after the commission of the earliest act of criminal profiteering. In order to constitute a pattern, the three acts must have the same or similar intent, results, accomplices, principals, victims, or methods of commission, or be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events.

Because the element of "pattern of criminal profiteering activity" requires predicate crimes, we ask whether the offense of leading organized crime causes injury or harm that is separate and distinct from the predicate crimes. *Johnson* I, 92 Wn.2d at 680. To make this inquiry, we may look to other clear evidence that the legislature considered each of the offenses to be a separate and distinct harm. *Calle*, 125 Wn.2d at 780.

## C. Other Evidence of Legislative Intent

¶35 We look for other clear evidence of legislative intent, such as the statutes' historical developments, differing purposes, and different locations in chapters of the criminal code. *Calle*, 125 Wn.2d at 779-80.

¶36 To combat organized crime in 1984, the legislature modeled chapter 9A.82 RCW after the federal RICO statute[19] and enacted it as the "Washington State Racketeering Act." FINAL LEGISLATIVE REPORT, 48th Leg., at 197 (Wash. 1984); *State v. Thomas*, 103 Wn. App. 800, 805, 14 P.3d 854 (2000), *review denied*, 143 Wn.2d 1022 (2001).

---

[19] The Racketeer Influenced and Corrupt Organizations Act (RICO), Pub. L. No. 91-452, tit. IX, 84 Stat. 922, 941-48 (1970) (codified as 18 U.S.C. §§ 1961-1968)).

¶37 The 1984 Final Legislative Report noted:

A Washington State RICO would provide similarly effective tools for law enforcement officers in their efforts to thwart the sophisticated elements of organized crime.

. . . .

New crimes aimed at conduct associated with organized crime and the use of funds gained through illegal activities are created including . . . leading organized crime. The commission of these new crimes and other serious crimes already in statute is known as "racketeering."

FINAL LEGISLATIVE REPORT, *supra*, at 197-98. In 1985, the legislature removed from the definitions of crimes constituting criminal profiteering those crimes that were not felonies under Washington law and renamed it the "Criminal Profiteering Act."[20] *Thomas*, 103 Wn. App. at 805.

¶38 The 1984 Final Legislative Report stated that the legislature intended to create "[n]ew crimes" because the legislature did not intend for the predicate crimes to merge with the new crime of leading organized crime. FINAL LEGISLATIVE REPORT, *supra*, at 197. We have noted:

[W]e observe that a community faces a greater peril from collective criminal activity than it does from criminal activity by one individual. A criminal enterprise which is composed of a number of persons, whether it is known as a gang, a mob, or a criminal syndicate, poses a great challenge to law enforcement agencies. Furthermore, the specter of such organized wrongdoing tends to make the general public feel that it is held hostage by the criminal enterprise.

*State v. Smith*, 64 Wn. App. 620, 625-26, 825 P.2d 741 (1992). Similarly here, it appears the legislature intended additional punishment for the societal harm of leading organized crime, a punishment separate and distinct from any underlying predicate crimes.

¶39 Harris's conviction for leading organized crime includes two additional and distinguishing elements: Harris

[20] Former ch. 9A.82 RCW, LAWS OF 1985, ch. 455, § 1.

led "any three or more persons" and he committed the predicate offenses "for financial gain." Further, the legislature intended additional punishment, separate and distinct from the underlying predicate crimes, for the societal harm of leading organized crime. Therefore, we hold that Harris's convictions for predicate offenses and for the crime of leading organized crime do not constitute double jeopardy.

¶40 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

HUNT and VAN DEREN, JJ., concur.

Review denied at 175 Wn.2d 1006 (2012).