# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| STATE OF WASHINGTON, | No. 45724-5-II |
| Respondent, | consolidated with |
|  | No. 46300-8-II |
| v. |  |
| SIDNEY A. POTTS, | UNPUBLISHED OPINION |
| Appellant. |  |

MELNICK, J. — Sidney Potts appeals his convictions for five counts of violating the uniform controlled substances act (UCSA)[1] and one count of leading organized crime. We conclude that the trial court did not violate Potts's double jeopardy rights by declaring a mistrial or by including his multiple convictions on the judgment and sentence, and did not err by denying Potts's CrR 8.3 motion. We also conclude that the trial court did not violate Potts's time for trial rights, that there was sufficient evidence to convict Potts of leading organized crime, that the prosecutor did not commit misconduct, and that the trial court did not commit reversible error in its instruction of the jury on leading organized crime. We conclude that admission of evidence did not violate the Washington privacy act,[2] and Potts was not denied effective assistance of counsel. Finally, we conclude the trial court did not commit reversible error in its denial of Potts's motion to suppress or imposition of an exceptional sentence, and Potts's statements of additional grounds (SAG) does not establish grounds for reversal. We affirm Potts's conviction and sentence.

---

[1] Ch. 69.50 RCW.

[2] Ch. 9.73 RCW.

FACTS

I.    OVERVIEW OF FACTS

Beginning on July 18, 2012, City of Longview Street Crimes Unit made a number of controlled drug buys from Potts.  An individual named J.H. agreed to participate in these buys after the police arrested J.H. and offered him a deal.  J.H. signed a contract to become an informant and told the police he could buy from one person, Potts.  J.H.'s primary police contact, Detective Rocky Epperson, told J.H. his charges would be dropped if he assisted in the investigation against Potts.

According to Epperson, the informant contract generally required that the person be truthful, not use drugs, set up deals when the police ask, and allow police to search his person, house, vehicle, and phone.  During Potts's trial, J.H. admitted to using and selling drugs while he worked as an informant.  Epperson testified that informants do not always comply with the contract, and that J.H.'s violations did not surprise him.   He also testified that J.H. did not appear under the influence during the times he worked with the Street Crimes Unit.

On July 17, J.H. contacted Potts by phone, with Epperson present.  Potts told J.H. he was busy and he would call J.H. back.  J.H. called Epperson later that night and told him that he and Potts were going to meet the next day.  On July 18, after a series of phone calls, J.H. told Potts he was at the Dairy Queen restaurant, and Potts said he would be driving a "'66 Oldsmobile" and would arrive in a few minutes.  10A Report of Proceedings (RP) at 2011.  Detective Kevin Sawyer followed Potts from Potts's home address to the Dairy Queen.

The police searched J.H.'s person and vehicle before he met with Potts and found no money or contraband.  They gave J.H. $1,800 and observed him enter Potts's car shortly after Potts arrived.  After the two drove a short distance, they went back to the Dairy Queen.  J.H. got into his

own car and drove to meet the police. The police followed J.H., searched him again, and found two ounces of methamphetamine and no money. The police successfully recorded the phone calls between J.H. and Potts before the meeting, but the recording device sent with J.H. to record the transaction failed. Captain Robert Huhta authorized the recordings.

On July 24, J.H. arranged another meeting with Potts at the Dairy Queen. Potts told J.H. he would drive a blue 1970 Chevelle. The meeting was almost identical to the first. The police recorded the phone calls and the transaction between J.H. and Potts. Captain Huhta authorized the recordings.

On July 31, J.H. again contacted Potts. Potts told J.H. to drive to one of Potts's car dealerships, the one on Alabama Street. Potts also had a dealership called Potts Family Motors on Oregon Way. Police searched J.H., found no drugs or money, and gave him $1,800 for the transaction. J.H. met Potts who got into J.H.'s car.

The police recorded the transaction with Captain Huhta's authorization. Potts told J.H. he only had one ounce of methamphetamine and then said, "They're on their way. Then it's going to be two or three days if you stay in touch." 10A RP at 2056. Potts instructed J.H. to answer his phone when he called because "it will be time to go (inaudible) two or three days, okay?" 10A RP at 2058. He told J.H., "He was getting out of it, that he was getting out of the business, that he was—some other people were going to take over, do his business for him or whatever." 10C RP at 2262-63. Potts told J.H. to divide the methamphetamine into quarter ounces, and to charge $150 for each quarter ounce. Potts told J.H., "Give me a call first (inaudible) so don't be afraid to move the shit, okay, as long as you make a hundred bucks an ounce." 10A RP at 2057.

Potts also inquired about whether other drug dealers were still working, and told J.H. to "step up" and to not be afraid to "move shit, as long as you make a hundred bucks an ounce." 10A RP at 2057. Potts said that he had to get the people money to rent a house when they arrived. J.H. drove to the alley behind Potts Family Motors and Potts got out of the car. The police met with J.H. and he turned over an ounce of methamphetamine.

Sometime in late July or early August, Angelita Llanes came to Washington. According to her, two people, named Nikki and Alfredo, sent her to Washington from California with four pounds of methamphetamine. She understood that Potts was retiring. Llanes was supposed to stay in Washington "[u]ntil they were able to send the next person, who was actually going to stay." 10B RP at 2217. She was to be paid $1,000 per pound. When she got money, she sent it to Nikki and Alfredo "through the bank." 10 BRP at 2217. When she first arrived, she testified, "A friend of [Potts]'s loaned us a room," and then Potts rented a house with his friend. 10B RP at 2218. The house was for her to stay in "and for the person who was going to come and stay, and work." 10B RP at 2218. According to Llanes, that person was Christian Velasquez.

Per instructions, upon her arrival, Potts met Llanes at her hotel. He took her to one of his car dealerships, took out two pounds of methamphetamine, instructed her to return to the hotel, cut the methamphetamine into ounces, and Potts would call her. Potts then took her around, introduced her to buyers, and told her how much to charge for the methamphetamine. Potts also told Llanes "who [she] [could] trust and who [she] [could]n't." 10B RP at 2215. J.H. was one of the people to whom Potts introduced Llanes.

4

When Potts introduced Llanes to J.H., Potts gave J.H. four ounces of methamphetamine. J.H. then met with Llanes days later to pay for the methamphetamine; however, he was $150 short. Llanes testified that she informed Potts about the shortage and J.H.'s plan to pay. J.H. did not tell the police about this first meeting with Llanes at the time.

On August 10, J.H., with the police's knowledge, arranged to meet Llanes at a Burger King restaurant to purchase methamphetamine. Initially, the police believed J.H. had not previously met with Llanes. J.H. had informed the police, and Epperson's incident report reflected, that Potts gave J.H. Llanes's name and number on August 9, 2012. However, at trial, J.H. confirmed that he actually met Llanes when she and Potts came to his house a week before, as described above.

Llanes, accompanied by Velasquez, went to the Burger King parking lot. Llanes testified that Velasquez had been in Washington for two or three days. J.H. got into the backseat of their car and gave Llanes money. J.H. asked if the money was going to Potts, and Llanes said yes. She delivered J.H. four ounces of methamphetamine. J.H. then left the scene and drove to meet with the police. Using a marked car, police officers pulled Llanes and Velasquez over a short distance from the Burger King and placed them under arrest. Sawyer obtained a search warrant and searched the car. He found a makeup kit containing 247 grams of methamphetamine and a considerable amount of money. He also found a pay/owe sheet, or ledger book.

On the same day, before J.H. met with Llanes, the police arrested Potts. The police applied for a search warrant for three properties: Potts Family Motors, Potts's second dealership, and Potts's home. Epperson's affidavit in support of the search warrant included all three of Potts's addresses, and the search warrant incorporated the affidavit. However, the actual warrant only listed Potts Family Motors in the finding of probable cause.

On August 15, the State charged Potts with one count of leading organized crime (count I), three counts of violation of the UCSA with delivery within 1,000 feet of a school bus route stop (count II, III, V), one count of violating the UCSA with possession within 1,000 feet of a school bus route stop (count VI), one count of violating the UCSA with delivery (count IV), and one count of money laundering (count VII). The State filed aggravating factors,[3] alleging that the current offense was a major violation of the UCSA for criminal profiteering. The State ultimately dropped the money laundering count. The trial court dismissed the enhancement on count V, and the State dismissed the enhancement on count VI.

II.     POTTS'S ARRAIGNMENT

Potts's arraignment occurred on August 28, before Judge Gary Bashor. Potts pleaded not guilty, and the court set trial for October 22. Prior to Potts's arraignment, the State had sought a subpoena for documents from the special inquiry judge, who at the time was Judge Bashor. On May 23, 2013, Potts filed a motion arguing that by presiding over his special inquiry proceeding, Judge Bashor was disqualified from presiding over his arraignment.[4] Potts argued that as a result he was never arraigned.[5] Judge Warning heard Potts's motion and denied it. He found that Judge Bashor was not prevented from holding an arraignment and even if he was, there was no error.

---

[3] RCW 9.94A.535(3)(e). We note that this statue was amended since Potts's case; however, the amendments do not affect this case.

[4] Potts consistently filed his own motions along with his attorney's motions. One judge initially was lenient and then disallowed this practice. Another judge allowed it freely. Additionally, Potts was represented by several different attorneys throughout the proceedings and was at times pro se. As a result, in places it is unclear what motion or decision Potts intends to appeal.

[5] The applicable statute is RCW 10.27.180.

III. JAIL CALL RECORDINGS

On October 17, the State filed a motion to appoint a special prosecutor. The basis for the motion was that the prosecutor on Potts's case, David Phelan, became aware that members of the Street Crimes Unit, namely Sergeant Ray Hartley and Detective Sawyer, had listened to a portion of Potts's jail calls. The officers heard conversations between Potts and his attorney at the time, Jim Morgan.[6] The State also later learned, and added to the request for a special prosecutor, that Detective Charlie Meadows had "observed several calls made by . . . Potts to an attorney" and that he "[did] not recall the date and times, and that he had not discussed this with any other officer at the Longview Police Department." Clerk's Papers (CP) at 84. Attorney Jeffrey Sullivan became the special prosecutor to investigate the matter. Prior to Sullivan's appointment, the county prosecutor issued a memorandum on October 16 instructing all officers to not access inmate-attorney calls.

Sullivan and his team obtained telephone records from the jail and learned how the inmate phone system worked. They also interviewed officers and employees. The jail recorded all calls placed by inmates, except those made to their attorneys. Recording attorney calls was avoided by attorneys providing their phone numbers to the jail's staff, who entered the phone numbers into a software program. When an inmate made a call, a series of directions on how to place a call played and before the call was placed, the inmate heard, "This call is subject to recording and monitoring. To continue press 1. To discontinue press 2." CP at 157. The investigation also revealed that

---

[6] Morgan was Potts's first attorney in this case. He withdrew on October 9, 2012, the day before it would have first come to Phelan's attention that Potts was calling on a non-attorney line. For the next several weeks, Potts had a string of attorneys who were assigned by the trial court and then announced a conflict of interest. Attorneys were assigned and removed on October 11, 16, and 18. Ultimately, the court appointed Bruce Hanify on October 25, and Hanify represented Potts until March 26, 2013, at which time Potts was pro se for several months.

anyone receiving a recorded phone call from the jail would hear a warning that said, "Hello, this is a collect call from [inmate's name] an inmate at [correction facility]. This call is subject to recording and monitoring. To accept this collect call press 1. To refuse this call press 2." CP at 157. Morgan's phone number was not entered into the computer program as an attorney line until after the issue came to the attention of a director from the jail on October 16. Captain Moses then added the number as an attorney line.

The phone system showed what agency listened to a call, but did not specify the individual who accessed it. It also indicated the date and time a call was monitored, but not how much of the call was monitored. Phelan told the investigators that on or about October 10, a member of the Street Crimes Unit told Phelan that he may have heard a phone call between Potts and his attorney. The conversation was about Potts not being able to pay Morgan. The investigators then identified five officers and one sergeant who admitted to listening to or overhearing calls between Potts and Morgan.

One sergeant, Hartley, told the investigators that he and members of the team had listened to many of Potts's jail calls since his arrest. He said he had overheard several phone calls between Potts and Morgan and as soon as he realized it was Morgan, he hung up.

Meadows told investigators that he had heard three of Potts's calls to his attorney while investigating a different inmate. He stated that he hung up when he realized the calls were to Potts's attorney, and remembered that on two occasions Potts was leaving a message asking his attorney to call him back. He also recalled that in the other call, Morgan was telling Potts, "[S]top calling on this line because it is a recorded line." CP at 161.

Epperson told investigators that he had listened to all of Potts's calls since Potts's arrest, and he kept a spreadsheet of the calls. He documented four calls between Potts and his attorney.

8

During three of the calls, Potts left a message for his attorney. In the fourth, Potts talked to one of Morgan's partners about motions that had been filed in the case and "several RCW's that Mr. Potts wanted to review." CP at 161. Epperson provided that no new or expanded investigation occurred based on the information from the calls.

Sawyer told the investigators he did not intentionally listen to any calls between Potts and Potts's attorney but may have inadvertently heard some. He provided that the Street Crimes Unit all work in a small office space and some of the other detectives listened to some of the calls. He specifically remembered Hartley saying he thought a call was to Potts's attorney and that Hartley immediately stopped listening. Sawyer thought the call was about Potts's failure to pay his attorney. He also stated that no new investigation started because of what was heard.

Detective Seth Libbey told investigators he overheard calls that other detectives listened to in the office. He stated that he did not intentionally play or download them himself.

The call log also showed that the Department of Corrections (DOC) accessed some of the calls. The two DOC officers involved with the Street Crimes Unit did not participate in the Potts investigation at all. The DOC sent out a memorandum asking anyone who had heard something to contact the special prosecutor. No one responded.

The only other person interviewed was Longview Police Officer Scott McDaniel who told investigators that he listened to calls by inmates who were arrested or lived in his patrol area. He was not involved in the Potts investigation but he did recall listening to one phone call between Potts and his attorney. He heard Potts talk about "filing a document" but nothing else. CP at 164. McDaniel recalled the attorney telling Potts the line was recorded and advising Potts not to discuss case details. The investigation found that these actions did not uncover new investigative leads.

9

On December 11, Potts filed a motion to dismiss under CrR 8.3. He argued that it was impossible to know the taint propounded on his case because there was no way to know exactly who heard the calls or what was said during the calls. On January 8, 2013, the trial court denied the motion, and found that Potts knew he was being recorded. The trial judge stated he did not reach the issue of prejudice because Potts was told the calls were being recorded. Potts filed several additional motions to reconsider that the trial court denied.

In an order denying a motion to reconsider, the trial court found that Potts was warned at the start of each call that the call would be recorded and Potts continued to speak. It further found that there was no evidence the information from the calls prejudiced Potts. The court concluded that Potts waived the attorney-client privilege as it related to the phone calls.

IV.    MOTION ON THE SEARCH WARRANT

Potts filed a motion to suppress evidence from the three locations police searched pursuant to a search warrant. The trial court denied the motion, except as to Potts's home address.[7] The court issued findings of fact and conclusions of law from the suppression hearing. It concluded that the issuing judge understood the search warrant authorized a search of all three properties. The court concluded that probable cause did not exist to search Potts's home. However, after the State filed a motion to reconsider, the court concluded probable cause existed for the police to search Potts's home. It then denied Potts's subsequent motion to reconsider. Even though the court upheld the search of all three properties, the State did not introduce evidence that was seized from the two properties not listed on the search warrant.

---

[7] Potts filed another motion for return of the property seized and argued that the judge did not make a finding of probable cause for searching his home; the trial court denied the motion. The court reiterated that it already ruled the warrant was valid but also stated that there were additional issues with standing and the parallel forfeiture proceeding.

10

V.       MOTIONS TO SUPPRESS RECORDINGS OF PHONE CALLS AND DELIVERIES

On October 16, 2012, Potts filed a pro se motion to suppress evidence from the intercepts on July 17, 18, 24, 31, and August 10.  He argued that the intercept authorizations did not comply with RCW 9.73.230.  Potts then filed another motion to suppress the intercepts on January 22, 2013.  He asserted that the statutory requirements for the intercepts were not satisfied.  Potts argued that each authorization only allowed one interception, and that the recordings did not include a time and location.  He also argued that the authorization on August 10, 2012, did not cover the events when Potts himself was not present.  He stated that the government did not make a good faith attempt to comply with RCW 9.73.230.  On May 6, 2013, Potts filed another motion to suppress any evidence obtained in violation of RCW 9.73.030, .230, & .050, which he referred to as supplemental.  He argued that the authorizations were invalid, that they did not authorize multiple recordings, and that the government failed to provide proper documentation after the fact.  On May 14, the trial court denied the motion as to the July authorizations but granted Potts's motion excluding the recordings from August 10.

Potts also objected to admission of the intercept recordings during trial.  He argued that the statute required the recordings to indicate the date and time at the beginning of the recordings.  Potts objected after the trial court admitted and played the recordings that did not include the date and time.  The trial court did not find that excluding the date and time was a bar to admission.

VI.      THE MISTRIAL

Potts's first trial began on August 27, 2013.  On Friday morning, the sixth day of trial, J.H. was set to testify.  At about 9:30 A.M., the defense attorney informed the court that new information had just come to light.  Before court began, Epperson had informed the prosecutor that J.H. had not been telling the truth about when he met Llanes.  The prosecutor immediately informed the

11

defense attorney. The defense attorney stated that apparently for the first time, J.H. told Epperson that Potts introduced him to Llanes about a week before August 10. The defense attorney requested time to reinterview J.H., and the trial court sent the jury home until the afternoon.

Court reconvened in the afternoon and defense counsel announced he had a motion to dismiss but he did not object to presenting the motion after taking testimony from the witnesses who were present. The trial continued and after several witnesses' testimony, the judge sent the jury home for the day. He notified the jury to return at 9:00 A.M. on Tuesday.

Defense counsel then presented the motion to dismiss. He told the court that up until that morning, everyone but Epperson believed that Llanes and J.H. had not met before August 10. Defense counsel had previously interviewed J.H. who said he had not met Llanes before August 10. However, during the morning break, J.H. admitted that Potts and Llanes had come to his home a week before August 10. At that time, Potts introduced J.H. to Llanes. J.H. also said he thought he had told Epperson about meeting Llanes previously. Defense counsel then interviewed Epperson and Epperson confirmed J.H. had told him about meeting Llanes previously.

The prior conversation between J.H. and Epperson occurred because Epperson realized there was a discrepancy in stories after Llanes's interview with the prosecutor and the Street Crimes Unit on February 22, 2013. Epperson then asked J.H. if he had met Llanes before August 10. Epperson received an affirmative answer. Epperson did not ask any further questions and did not tell anyone about this conversation. Epperson told the prosecutor about the information the morning of the sixth day of trial because J.H. spoke to him about it again that day.

The trial court heard from both parties. Potts argued that the new evidence constituted a violation of CrR 4.7, and moved to dismiss under CrR 8.3. The State responded that dismissal was an extraordinary remedy and not appropriate for this case. The State also clarified that

12

Epperson was not present in J.H.'s original interview with the defense when J.H. failed to disclose he met Llanes before August 10, and therefore, Epperson did not know of the discrepancy. Potts continued to argue that the information affected his trial strategy and he did not know how to deal with the information without further research. The defense attorney stated that this information affected his cross-examination of Llanes and Velasquez, along with his closing argument.

The trial court considered the State's recommendation to suppress the evidence, but found it would prejudice Potts. The trial court found a violation of CrR 4.7 but did not immediately provide a remedy for the violation. The court remarked the parties would have over three days to research and work on the issue. It also stated that dismissal of all counts was "too much given the fact that we're talking about . . . multiple counts," and it also found that counts II, III, and IV were unaffected. 6B RP at 1122.

Court reconvened Tuesday morning, September 10, and Potts again moved for dismissal but expanded the motion to include misconduct by the State under CrR 8.3(b). Potts also personally wrote a motion for dismissal and provided it to the court.

Over the three and a half day break, defense counsel had interviewed Llanes. She disclosed that she and Potts met with J.H. a week before August 10. At that time, she provided J.H. with four ounces of methamphetamine. A few days later, J.H. called her, they met, and he paid her for the methamphetamine but was short $150. Defense counsel stated that prior to this disclosure, J.H. had stated no other drug transactions occurred.

According to defense counsel, after learning this information, Epperson told J.H. he needed to tell the truth, that Llanes had been interviewed, and that "there's going to be a problem if your story and [Llanes's] don't match up." 7 RP at 1142. Defense counsel reinterviewed J.H. J.H. confirmed that he received four ounces of methamphetamine from Potts and Llanes the week

before August 10, and that he paid Llanes later in the week. Defense counsel emphasized that prior to these disclosures, Epperson had testified in front of the jury that J.H. received Llanes's contact information when Potts called him the night of August 9 and told him when the drug deal would happen.

Potts argued that because J.H. acted as a government agent and the conduct amounted to outrageous government misconduct, the only appropriate remedy was dismissal, not a mistrial. The trial court then asked the defense to address mistrial versus dismissal. It said, "[I]sn't part of your argument that . . . you've been working under this theory since Day 1 and you've been preparing for the trial and the theory has changed? So doesn't a mistrial afford you the opportunity to move forward based on the new information and prepare for that?" 7 RP at 1147-48. Potts responded that mistrial did not address the issue of misconduct. He reargued that the appropriate remedy was dismissal.

The State argued that Epperson may have made a mistake but he did not intentionally act untruthfully because he did not know J.H. lied. The State also contended that J.H. was not a state agent. The State asserted that the defense had not shown how the disclosure fundamentally changed its theory of the case and that the court should follow the hierarchy of remedies: first continuance, then suppression, mistrial, and finally dismissal. The court asked the State to address mistrial versus dismissal. The State responded that it was "a little leery of a mistrial versus dismissal, I think the preference would be a mistrial but . . . I think that a mistrial does not preserve Mr. Potts'[s] ability to make a double jeopardy challenge on a subsequent trial." 7 RP at 1162. The State stated it needed more time to research the double jeopardy issue. The defense represented that double jeopardy arguments are not preserved unless the State provoked the mistrial.

14

At midmorning, the judge took a break to research the issues and consider the parties' arguments. When the judge returned in the early afternoon, he heard more argument from the parties.

Defense counsel represented that he had listened to hours of tapes for the case "with an eye toward the Defense theory." 7 RP at 1172. Defense counsel stated, "I painstakingly went through these things and had planned, if the testimony from this witness is this, I'm going to play on this particular tape from 20 minutes and 35 seconds to 20 minutes and 55 seconds." 7 RP at 1172. He told the court if he had this new information, his opening statement would have been different, and he would have cross-examined Epperson differently. He finally said, "It's simply not possible for me to provide effective assistance of Counsel, and it's all due to government misconduct." 7 RP at 1176. He stated, "The jury is now tainted by information that we know is not true" and that he cannot redo all the work that has been done. 7 RP at 1175. He concluded, "[T]he trial simply cannot proceed and dismissal is the appropriate remedy." 7 RP at 1181.

The State opined that if it did not move for the appropriate remedy it would be held against them. The State told the court it would be as accommodating as possible and not oppose a variety of remedies up to and including a mistrial, without specifying what it felt was appropriate. The State finally offered, "I would ask the Court . . . to fashion a remedy that allows [the defense attorney] an [sic] opportunity to review whatever is necessary and present an effective—effective case." 7 RP at 1179-80.

The trial court addressed both the defense counsel's motion and Potts's pro se motion. The court noted that defense counsel argued the jury taint required no remedy other than dismissal. It provided a long oral ruling on the motions. The court reasoned that while a violation occurred, it did not shock the conscience. The court found that dismissal was an inappropriate remedy because

Potts's right to a fair trial was still intact. It also considered the issue of ineffective assistance of counsel, stating that it "looms fairly large." 7 RP at 1195. It acknowledged that mistrial did not really punish the government for bad acts but discounted a continuance as a viable option because it risked information becoming "stale" for jurors. 7 RP at 1195. Ultimately, the trial court declared a mistrial.

Potts objected to the mistrial. The prosecutor asked to put a couple things on the record, and stated, "[I]t's the State's position, we had a duty or obligation to provide the Court with alternatives, but we did not specifically ask for a mistrial." 7 RP at 1198. The court responded, "I wrote down, the State needs to provide alternative remedies. I put continuance and mistrial." 7 RP at 1198. The State only responded, "Okay." 7 RP at 1198. The trial court informed the jury that it had declared a mistrial and they were no longer needed.

On September 17, Potts personally presented a motion to dismiss the charges based on double jeopardy, which defense counsel joined. Defense counsel later also filed a motion to dismiss on double jeopardy grounds. On November 15, Potts himself argued his motion saying that the mistrial was not in the interest of justice or a manifest necessity, and that the court did not consider his constitutional protections or question the grounds for his objection. Defense counsel then presented argument that the court did not balance or weigh other alternatives to a mistrial, and that it should have explored a continuance.

The trial judge stated that although his thought process was "unuttered," he did consider alternatives. 7 RP at 1270. He reiterated and specified his reasoning for not granting suppression of the evidence or a continuance. The judge stated that he reasoned he would take away the defense's opportunity to cross-examine and impeach witnesses with a suppression motion and would force the defense attorney to provide ineffective representation with a continuance. The

16

judge stated, "I agree that jeopardy did attach, I agree that the Defense did not ask for a mistrial, and I agree that the Defense did object timely." 7 RP at 1273. The trial judge stated,

> So . . . in my reasoning, I think even though I didn't . . . use the magic words of 'manifest necessity,' my sense at the time was that, based on the situation that was presented, the revelations that came to be, the right to a fair trial, the right to cross-examine, the right to be adequately prepared, I—I felt it was in the best interest of—of all parties to—to—to declare the mistrial.

7 RP at 1276.

The trial court denied the motion for dismissal based on the mistrial. The State asked the court to specifically put on the record its thoughts about Potts's double jeopardy rights. The judge referenced the part of the transcript in which the defense stated double jeopardy would bar a retrial unless the actions were prompted by the State. It also stated, "Obviously, it was in my mind at the time. I had discussed double jeopardy. It was something I—I considered at the time." 7 RP at 1277-78.

VI.    THE TRIAL

A new trial began on November 19, 2013. Both Epperson and J.H. testified. On cross-examination, the defense impeached each of them about when J.H. met Llanes. The defense also impeached J.H. about his drug use. The testimony at trial is summarized in the overview above.

Several times during trial, Potts objected to the admission of the intercept recordings. He argued that because the date and time were not on several of the recordings, they violated chapter 9.73 RCW. The trial court overruled Potts's objections, and the State played the recordings, except those from August 10.

After the State rested, the parties discussed the charges and the jury instructions. On the leading organized crime count (count I), Potts moved to dismiss the aggravator. He argued that the major violation of the UCSA aggravator did not apply to the crime because leading organized

17

crime is not a part of the specific list of offenses in the statute. The trial court denied the motion and found that the statutory language[8] permitted the aggravator.

The parties also disagreed on the "to convict" jury instruction for leading organized crime, specifically on how to make clear to the jury that Potts's had to be a leader. Potts's alternative proposed instruction included extra language in the elements section and an additional element. The trial court ultimately gave an instruction that did not use accomplice language but said, "[T]he State must prove beyond a reasonable doubt that the defendant was the leader of a criminal profiteering organization, not just a member." CP at 1397.

In closing argument, Potts emphasized the difference between what the State proved beyond a reasonable doubt and what might have happened. In concluding, Potts returned to the idea of speculation saying, "[T]hink of the difference between speculation, what you think might have happened, probably happened, could have happened, and what you have evidence of." 11B RP at 2624. He argued that the only information about Velasquez was that he came from California and "[a]nything else . . . is pure speculation." 11B RP at 2624.

During the State's rebuttal closing argument, the prosecutor said, "There's another word for speculation, and the word is circumstantial." 11B RP at 2627. Potts objected on the grounds that the State misstated the law, and the court responded, "So this is argument. The jury is instructed to refer to the jury instructions as to any definitions of the law." 11B RP at 2627. The State then continued its argument, first saying, "And don't take my word for it; there is a jury instruction." 11B RP at 2627. It then read the definition of circumstantial evidence to the jury. Potts raised this issue again post-trial as part of a motion to arrest judgment that the trial court denied.

_____

[8] RCW 9.94A.535(3)(e)(i); ch. 69.50 RCW.

The jury found Potts guilty on all charges and all aggravators. The trial court entered its judgment and sentence on December 19. The trial court sentenced Potts to 413 months of confinement. At sentencing, Potts argued that violation of the UCSA counts should merge with his leading organized crime count, and that the counts were the same course of conduct. The trial court concluded that the counts did not merge and were not the same course of conduct.

Potts appeals. He also filed a notice of appeal following denial of his motion for return of property.

ANALYSIS

I.    DOUBLE JEOPARDY

Potts argues the trial court violated his double jeopardy rights both by granting a mistrial and because several of his convictions were the same criminal conduct. We disagree.

A.    Standard of Review

A double jeopardy claim is a question of law we review de novo. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). "A double jeopardy claim may be raised for the first time on appeal." *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006); RAP 2.5(a). State and federal constitutional protections against double jeopardy prohibit multiple punishments for the same offense. *State v. Kier*, 164 Wn.2d 798, 803, 194 P.3d 212 (2008); U.S. CONST. amend. V; WASH. CONST. art. 1 § 9.

B.    The Mistrial

Potts argues that by declaring a mistrial and discharging the jury, the trial court violated his double jeopardy rights. Specifically, Potts argues the trial court denied his right to a verdict by a particular tribunal.[9] Potts makes essentially the same assertion in his SAG. We disagree.

The federal and state protections against double jeopardy exist not solely to prevent a second prosecution for the same offense, but also to protect "the 'valued right (of the defendant) to have his trial completed by a particular tribunal.'" *State v. Jones*, 97 Wn.2d 159, 162, 641 P.2d 708 (1982) (quoting *Arizona v. Washington*, 434 U.S. 497, 503, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978)). Jeopardy attaches after the jury is selected and sworn. *Jones*, 97 Wn.2d at 162. However, the declaration of a mistrial does not always prevent retrial. *Jones*, 97 Wn.2d at 162.

In the case of a mistrial, we first determine whether jeopardy attached in the first instance. *State v. Juarez*, 115 Wn. App. 881, 887, 64 P.3d 83 (2003). Next, we ask whether the defendant freely consented to a mistrial. *Juarez*, 115 Wn. App. at 888. Retrial is barred unless either the defense freely consented to a mistrial, or some "manifest necessity" required discharge of the jury over the defendant's objection. *Rich*, 63 Wn. App. at 747.

We give "'great deference'" to the trial court's decision to declare a mistrial, *State v. Strine*, 176 Wn.2d 742, 753, 293 P.3d 1177 (2013) (quoting *Jones*, 97 Wn.2d at 163), but the trial court's broad discretion is "not unbridled." *State v. Browning*, 38 Wn. App. 772, 775, 689 P.2d 1108 (1984). A mistrial frees the defendant from further prosecution, unless it is prompted by "'manifest necessity.'" *Browning*, 38 Wn. App. at 775 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982)). "Manifest necessity" means that "'extraordinary and

---

[9] Potts seems to argue this is a right separate and independent from the double jeopardy protections. However, they are interconnected with the shared goal of not prolonging "the ordeal of the accused by adding to the financial and emotional burden he must shoulder while his guilt or innocence is determined. Moreover, exposure to a second tribunal may even increase the chances of an innocent defendant[ ] being convicted." *State v. Jones*, 97 Wn.2d 159, 162, 641 P.2d 708 (1982)

striking'" circumstances must be present that "'clearly indicate . . . that the ends of substantial justice cannot be obtained without discontinuing the trial.'" *Jones*, 97 Wn.2d at 163 (quoting *State v. Bishop*, 6 Wn. App. 146, 150, 491 P.2d 1359 (1971)).

We review a trial court's exercise of its discretion to grant or deny a mistrial for abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). Three principles generally guide us in determining whether a trial court abused its discretion in granting a mistrial for "'manifest necessity. They include (1) whether the court 'act[ed] precipitately . . . [or] gave both defense counsel and the prosecutor full opportunity to explain their positions'; (2) whether it 'accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding'; and, (3) whether it considered alternatives to declaring a mistrial. *State v. Melton*, 97 Wn. App. 327, 332, 983 P.2d 699 (1999) (footnotes omitted) (quoting *Arizona*, 434 U.S. at 515-16).

The parties agree that jeopardy attached at the first trial. However, Potts did not freely consent to the mistrial and he contends it should have barred a retrial. The State argues that the trial court's declaration of a mistrial was done in the interest of justice. Therefore, we must determine whether the trial court abused its discretion by granting a mistrial for manifest necessity.

First, Potts argues that he did not have a full opportunity to respond to the possibility of a mistrial. In so saying, Potts does not paint a complete picture of the events that transpired at trial. The issue that ultimately led to a mistrial, arose on the sixth day of Potts's first trial on a Friday morning. The trial court sent the jury away, gave defense counsel time to reinterview J.H., and then heard argument from both defense counsel and the State. Court reconvened after the interview, and defense counsel presented a motion to dismiss. The trial court sent the jury home

early, heard more argument from the parties, and then found a violation of CrR 4.7, but granted a continuance until the following Tuesday morning so the parties could engage in more discovery.

On Tuesday morning, the parties returned to court and defense counsel presented another motion to dismiss. The trial court heard argument from both parties and it asked for argument on the remedy of mistrial versus the remedy of dismissal. The trial court dismissed the jury at midmorning to return in the afternoon to "take a moment to go back and read the cases that the parties have provided and do some research." 7 RP at 1169. The judge reviewed the issues in chambers and then took more argument. During this process, the trial court asked Potts, "[I]sn't part of your argument that . . . you've been working under this theory since Day 1 and you've been preparing for the trial and the theory has changed? So doesn't a mistrial afford you the opportunity to move forward based on the new information and prepare for that?" 7 RP at 1147-48. The defense counsel responded that mistrial did not address the issue of misconduct. He argued that the appropriate remedy was dismissal, and that the jury had been tainted by Epperson's testimony.

The trial court did not act precipitately in making its decision. The court issued a long oral ruling in which it reviewed the arguments of the parties and its own reasoning. Both parties had several opportunities to argue their positions and both parties were made aware of all the possible remedies.

Second, Potts argues that the court "did not give 'careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding.'" Br. of Appellant at 23 (quoting *State v. Robinson*, 146 Wn. App. 471, 480, 191 P.3d 906 (2008)). However, the trial court specifically asked about Potts's double jeopardy rights. It inquired into defense counsel's ability to represent his client. Defense counsel reiterated several times that the new information made it impossible for him to properly represent his client. In ruling, the court discussed defense counsel's

need to effectively provide assistance of counsel as one of its main reasons for granting a mistrial. The court later stated that even though it did not "use the magic words of 'manifest necessity,' [its] sense . . . was that, based on the situation that was presented, the revelations that came to be, the right to a fair trial, the right to cross-examine, the right to be adequately prepared," granting a mistrial was in the parties' best interest. 7 RP at 1276. The trial court considered Potts's interests.

Finally, Potts argues that the court did not "consider all the available alternatives." Br. of Appellant at 24. He states that the trial court took away his opportunity for a memorable impeachment. However, the record shows that the trial court worked through various remedies available to it: suppression, continuance, mistrial, and dismissal. Based on the facts and the parties' arguments, mistrial was the most appropriate remedy.

Furthermore, in the subsequent hearing on Potts's motion to dismiss based on alleged double jeopardy violations, the trial court specified its reasoning saying that it did consider alternatives, and reiterated its reasoning. The trial court provided that it thought suppression was unfair to the defense, that a continuance would not give counsel enough time to prepare or would make the evidence stale for the jury, and a dismissal was too severe. We conclude that the mistrial served the interests of justice, and the trial court did not abuse its discretion.

C.    Same Offense

Potts also argues that he should not have been convicted of both leading organized crime and the predicate drug offenses because they are the same criminal conduct and violate the state and federal constitutional prohibitions against double jeopardy. We disagree.

"'Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense.'" *Kier*, 164 Wn.2d at 803-04 (quoting *State v. Freeman*, 153

23

Wn.2d 765, 771, 108 P.3d 753 (2005)). In determining legislative intent, we examine three factors. *Kier*, 164 Wn.2d at 804. First, we look at express or implicit legislative intent based on the criminal statutes involved. *Kier*, 164 Wn.2d at 804. Second, if the legislative intent is unclear, we may turn to the "same evidence" test. *Kier*, 164 Wn.2d at 804. Third, we may use the merger doctrine to help determine legislative intent where the degree of one offense is elevated by conduct constituting a separate offense. *Kier*, 164 Wn.2d at 804. We have also recognized that, "even if two convictions would appear to merge on an abstract level under this analysis, they may be punished separately if the defendant's particular conduct demonstrates an independent purpose or effect of each." *Kier*, 164 Wn.2d at 804.

First, the leading organized crime statute and the possession and distribution statutes do not contain specific language authorizing separate punishments for the same conduct. RCW 9A.82.060, 69.50.401. Therefore, we turn to the "same evidence" test.

The "same evidence" test examines whether the "crimes are the same in law and in fact." *Kier*, 164 Wn.2d at 804. "Under the same evidence rule, if each offense contains elements not contained in the other offense, the offenses are different and multiple convictions can stand." *Jackman*, 156 Wn.2d at 747. The court must determine "'whether each provision requires proof of a fact which the other does not.'" *Jackman*, 156 Wn.2d at 747 (quoting *State v. Baldwin*, 150 Wn.2d 448, 455, 78 P.3d 1005 (2003)). The legal element analysis requires more than just a facial comparison of the statutory offenses' requirements. *Hughes*, 166 Wn.2d at 684. Once the court determines that two crimes do not require the "same evidence," a presumption exists that they are not the same, which "should be overcome only by clear evidence of contrary intent." *State v. Calle*, 125 Wn.2d 769, 779-80, 888 P.2d 155 (1995). The "same evidence" test is a rule of statutory construction and serves as "a means of discerning legislative purpose." *Calle*, 125 Wn.2d at 778.

24

The test is not controlling "where there is a clear indication of legislative intent." *Calle*, 125 Wn.2d at 778.

In *State v. Harris*, we held that the elements for leading organized crime are distinguishable from those of the predicate offenses. 167 Wn. App. 340, 353, 272 P.3d 299 (2012). Specifically, leading organized crime has the additional elements of "organizing, managing, directing, supervising, or financing any three or more persons" and doing so for "criminal profiteering." RCW 9A.82.060; *Harris*, 167 Wn. App. at 353. In Potts's case, the predicate offenses of possession of methamphetamine with the intent to deliver or delivery of methamphetamine do not have these additional elements. RCW 69.50.401. They are also distinguishable from each other because each has a different date. Furthermore, in *Harris*, we held that the offense of leading organized crime causes injury or harm that is separate and distinct from the predicate crimes. 167 Wn. App. at 352-54, 357. Because Potts's convictions do not satisfy the same evidence test, he cannot establish that his convictions violated his double jeopardy rights.

Potts argues that we misapplied the same evidence test in *Harris*, 167 Wn. App. 340, and asks us to overturn the decision. He argues that there were two errors in *Harris*: we did not determine that each offense included an element not included in the other and we did not consider the evidence used to support each conviction.[10] However, because *Harris* conducted the majority of its analysis under the merger prong, it did not focus its analysis on the "same evidence" test prong. 167 Wn. App. at 354.

---

[10] Potts also argues the same error occurred in *State v. Hayes*, 164 Wn. App. 459, 484-85, 262 P.3d 538 (2011). However we need not consider this argument because in *Hayes*, there is express legislative intent and Potts recognizes that situation is distinguishable from his case. He does not rely on *Hayes* to make his argument.

*Harris* did hold that the elements for leading organized crime were distinguishable from those of the predicate offenses. 167 Wn. App. at 353. Potts also ignores a crucial part of *Harris* where we noted that the "legislature intended to create '[n]ew crimes' because the legislature did not intend for the predicate crimes to merge with the new crime of leading organized crime." 167 Wn. App. at 357 (quoting Final Legislative report, 48th Leg., at 197 (Wash. 1984)). Further, we concluded that "the legislature intended additional punishment for the societal harm of leading organized crime." *Harris*, 167 Wn. App. at 357. Additionally, although *Harris* did not focus on the "same evidence" test, it concluded that leading organized crime and its predicate offenses were not the same in law and fact. 167 Wn. App. at 357-58. We adhere to *Harris*, and conclude that the trial court did not violate Potts's double jeopardy rights.

II.     CrR 8.3 MOTION FOR VIOLATING RIGHT TO COUNSEL

Potts argues that the police violated his constitutional right to confer privately with counsel when they listened to his jail phone calls. Because he waived the right, we disagree.

A.      Standard of Review[11]

We review a trial court's decision to not dismiss an action based on a violation of the right to counsel and under CrR 8.3(b) for abuse of the trial court's discretion. *State v. Granacki*, 90 Wn. App. 598, 602 n.3, 959 P.2d 667 (1998). We review a claim of denial of a constitutional right de novo. *State v. Stone*, 165 Wn. App. 796, 810, 268 P.3d 226 (2012).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel, which includes the right to confer privately with that

---

[11] Potts applies a constitutional error, de novo standard of review in his appellate brief. However, Potts does not raise this issue for the first time on appeal because he previously raised the issue in a CrR 8.3 motion below. Therefore, we will review whether the trial court erred by denying his CrR 8.3 motion to dismiss for a violation of his right to counsel. We decline to rely on Potts's proposed standard of review.

counsel. U.S. CONST. amend. VI; *State v. Peňa Fuentes*, 179 Wn.2d 808, 818, 318 P.3d 257 (2014). "Intrusion into private attorney-client communications violates a defendant's right to effective representation and due process." *State v. Garza*, 99 Wn. App. 291, 296, 994 P.2d 868 (2000). "The right to counsel may be affirmatively waived, but such a waiver must be knowing, voluntary, and intelligent." *State v. Afeworki*, 189 Wn. App. 327, 344, 358 P.3d 1186 (2015).

The validity of any waiver of a constitutional right and the inquiry required by the court to establish the waiver depend on the circumstances of the case, including the defendant's experience and capabilities. *State v. Cham*, 165 Wn. App. 438, 447, 267 P.3d 528 (2011), *review granted,* 175 Wn.2d 1022, 289 P.3d 627 (2012). In addition, the inquiry differs depending on the nature of the constitutional right at issue. *Cham*, 165 Wn. App. at 447. Here, the circumstances are more akin to waiving the attorney-client privilege than they are to waiving the right to a lawyer in court. In the former circumstance, a defendant waives attorney-client privilege by voluntarily including a third party that is not necessary for the communication or otherwise covered by the privilege. *State v. Wilder*, 12 Wn. App. 296, 300, 529 P.2d 1109 (1974).

B.     Waiver

Potts argues that the State failed to prove that he voluntarily, knowingly, and intelligently waived his right to privately confer with his counsel. However, after the special investigator assigned to look into the jail phone calls issued a report, Potts filed a motion to dismiss under CrR 8.3. CrR 8.3(b) permits the trial court, after notice and hearing, to dismiss any criminal prosecution in the furtherance of justice, because of arbitrary action or governmental misconduct "when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Potts argued to the trial court that it was impossible to know the impact of the jail phone calls on his case because there was no way to know exactly who heard the calls or what was said

27

during the calls. The trial court denied the motion, finding that Potts knew his calls were being recorded. The court stated that it did not reach the issue of prejudice because Potts waived his right when he proceeded after being told his calls were recorded. We agree with the trial court.[12]

The evidence the trial court relied on derived primarily from the special prosecutor's report. This report stated that when a call was made from the jail, a recording played to both the caller and the receiver, warning that the call was being recorded. For Potts to place a call after the warning, he had to press a button acknowledging he wanted to proceed. Furthermore, two of the people who heard portions of Potts's calls told the special prosecutor they heard Potts's attorney tell Potts that he was calling on a recorded line. We conclude the evidence the trial court relied on demonstrated Potts knowingly and voluntarily waived his right. The trial court did not abuse its discretion.[13]

III.    RIGHT TO A SPEEDY TRIAL

Potts argues that the trial court violated his time for trial rights. We disagree.

A.    Standard of Review

We review an alleged violation of the time for trial rule de novo. *State v. Kenyon*, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). We review a trial court's determination on a motion to

---

[12] Potts makes many different arguments about prejudice. However, we do not address these arguments because we uphold the trial court's finding of waiver.

[13] Potts also argues that because the decision to deny his motion to reconsider preceded *State v. Peña Fuentes*, 179 Wn.2d 808, 318 P.3d 257 (2014), the trial court did not know it was required to find facts beyond a reasonable doubt when dealing with government eavesdropping. Potts asks that we remand his case for an evidentiary hearing in light of *Fuentes*. In *Fuentes*, however, the court held that dismissal is not required when there is no possibility of prejudice. 179 Wn.2d at 819. Additionally, prior to *Fuentes*, courts assumed that a violation of attorney-client privilege was reversible error. 179 Wn.2d at 819. The standard before *Fuentes* was to reverse automatically and *Fuentes* established that the presumption of prejudice is rebuttal; therefore, the case did not affect the outcome for Potts.

dismiss for manifest abuse of discretion. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997). For these motions, we will not disturb the trial court's decision unless the appellant makes a clear showing that the trial court's determination is manifestly unreasonable or exercised on untenable grounds, or for untenable reasons. *State v. Saunders*, 153 Wn. App. 209, 216, 220 P.3d 1238 (2009). We may affirm the trial court's ruling on any grounds the record supports, including those the trial court did not explicitly articulate. *State v. Ginn*, 128 Wn. App. 872, 884 n.9, 117 P.3d 1155 (2005). If the trial court erred, we ask whether, had the error not occurred, the outcome of the trial would have been materially different. *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012).

### B.     Arraignment

Potts argues that because the same judge who presided over his special inquiry proceedings presided over his arraignment, the trial court did not have jurisdiction to arraign him.[14] Potts provides no authority that a violation of RCW 10.27.180 requires dismissal. Arguments without legal support need not be considered. RAP 10.3(a)(6); *State v. Lord*, 117 Wn.2d 829, 853, 822 P.3d 177 (1991). However, Potts also raises the issue in his SAG, which we will consider.[15] We conclude that any error with Potts's arraignment was harmless.[16]

---

[14] Potts argues that the judge did not have "subject matter jurisdiction," which refers to the court's authority to hear a case. Potts's use of the term is inaccurate. Here, the judge was simply disqualified by statute from presiding over hearings that arise from the special inquiry.

[15] The authority Potts cites to support his argument that dismissal is required is misplaced; however, we review the issue pursuant to RAP 10.10(c).

[16] Potts also asserts in his SAG that the trial court erred by denying his "pro se Objection to the Out of Time Amended Information and Arraignment, and Renewal of Motion to Dismiss" and subsequent motions for speedy trial violation. SAG at 17-18. In these motions, he solely argued that the special inquiry judge should not have presided over his arraignment. We address this argument in the above time for trial analysis, and conclude the trial court did not err by denying the motion.

RCW 10.27.180 states,

The judge serving as a special inquiry judge shall be disqualified from acting as a magistrate or judge in any subsequent court proceeding arising from such inquiry except alleged contempt for neglect or refusal to appear, testify or provide evidence at such inquiry in response to an order, summons or subpoena.

Generally, a defendant must be brought to trial 60 days after his commencement date, or arraignment. CrR 3.3(b)(1)(i), (c)(1). The commencement date is the date from which the time for trial is calculated. CrR 3.3(b)(1). CrR 3.3(h) states, "A charge not brought to trial within the time limit determined under this rule shall be dismissed with prejudice." A defendant must be arraigned not later than 14 days after the filing of an information. CrR 4.1(a)(1). Furthermore, "A party who objects to the date of arraignment on the ground that it is not within the time limits prescribed by this rule must state the objection to the court at the time of the arraignment." CrR 4.1(b). "A party who fails to object as required shall lose the right to object, and the arraignment date shall be conclusively established as the date upon which the defendant was actually arraigned." CrR 4.1(b).

Here, the State obtained an order directing the production of some of Potts's financial records before the special inquiry judge in Cowlitz County, Judge Bashor.[17] Judge Bashor then presided over Potts's preliminary appearance and arraignment on August 28, 2012. At that hearing, Potts entered a plea of not guilty and the court set the trial date for October 22. The arraignment occurred within 14 days of filing the information. The initial trial date set on that day also complied with time for trial rules because it was within 60 days of the arraignment. CrR 3.3(b)(1).

---

[17] We note that subsequently in the trial court, Potts sought confirmation that the proceeding was not in fact a special inquiry procedure, and the State conceded the point.

Potts did not object at the time of his initial appearance and arraignment. On May 23, 2013, however, Potts moved for dismissal, citing his improper arraignment. On the same day, he objected to the State filing an amended complaint. The trial court found that there was no err in Judge Bashor arraigning Potts and even if there was, it did not warrant dismissal.

Potts argues that his "actual arraignment" took place when the State filed the amended information on May 23, 2013, nine months after the original information was filed. Br. of Appellant at 81. Potts supports this contention by arguing that May 23 was the day he entered a not guilty plea before a judge authorized to preside over the hearing; however, he cites no legal authority. Additionally, outside of this contention, Potts does not argue any actual prejudice or violations of his time for trial rights. There is no indication that his trial occurred outside the allowable time period.

In *State v. Neslund*, 103 Wn.2d 79, 83, 690 P.2d 1153 (1984), our Supreme Court upheld a suppression motion issued by a special inquiry judge before he presided over the special inquiry hearing. The court stated, "Since the special inquiry judge proceeding can be used to gather evidence of a crime only *before* the defendant has been charged with that crime . . . the effect of our holding is to disqualify the special inquiry judge from acting in charging and post-charging proceedings in any case which came before him on special inquiry." *Neslund*, 103 Wn.2d at 83 (citation omitted). The court also held, "If proceedings arising out of the special inquiry judge proceeding are held after the special inquiry is concluded, but before the defendant is charged, the special inquiry judge will be disqualified from acting in those proceedings as well." *Neslund*, 103 Wn.2d at 83.

Similar to *Neslund* where there was no risk that the judge's role as special inquiry judge prejudiced the following proceeding, Judge Bashor improperly presiding over Potts's arraignment

31

could not have impacted the arraignment. It did not violate Potts's time for trial rights, and Potts does not argue it otherwise impacted his trial. At the arraignment, Potts entered a plea of not guilty, and the court set a trial date. No other matters were addressed. The judge's substantive knowledge of the case was not utilized in any way to prejudice Potts. Therefore, while it would be error for Judge Bashor to preside over both a special inquiry proceeding in Potts's case and his arraignment, any error was harmless. Additionally, the court did not base its decision to deny Potts's motion to dismiss on untenable grounds and therefore, did not abuse its discretion.

IV.    INSUFFICIENT EVIDENCE—LEADING ORGANIZED CRIME

Potts argues that no reasonable trier of fact could have found him guilty of leading organized crime. Specifically, Potts contends that the evidence was insufficient because he had no knowledge of Velasquez's involvement.[18] We disagree.

A.    Standard of Review

The State has the burden of proving every element of the crimes charged beyond a reasonable doubt. *State v. McCullum*, 98 Wn.2d 484, 489, 656 P.2d 1064 (1983). Sufficient evidence exists to support a conviction if when viewing the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Ehrhardt*, 167 Wn. App. 934, 943, 276 P.3d 332 (2012). A defendant claiming insufficiency of the evidence admits the truth of the State's evidence and all inferences

---

[18] Potts's makes a related assertion in his SAG but it is unclear. He asserts that the trial court erred by denying his motion to dismiss the charge. He also asserts that Llanes's testimony is the only testimony that related to his leading organized crime conviction, and that her testimony did not show he was the leader. He seems to be arguing either that the "to convict" jury instruction was improper or that there was insufficient evidence to convict him of leading organized crime. Both issues are addressed in this opinion.

that can reasonably be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

We defer to the jury on its assessment of credibility of witnesses and the persuasiveness of the evidence. *State v. Bonisisio*, 92 Wn. App. 783, 794, 964 P.2d 1222 (1998). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Inferences drawn from circumstantial evidence "must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). Where "'the inferences and underlying evidence are strong enough to permit a rational fact finder to find guilt beyond a reasonable doubt, a conviction may be properly based on pyramiding inferences.'" *State v. Bencivenga*, 137 Wn.2d 703, 711, 974 P.2d 832 (1999) (quoting 1 Clifford S. Fishman, *Jones on Evidence: Civil and Criminal* § 5.17, at 450 (7th ed. 1992)) (internal quotations omitted).

B.      Elements of Leading Organized Crime

Potts argues that the State presented no evidence indicating that he had met or had any contact with Velasquez. Additionally, he argues that the State only proved Velasquez's knowledge and presence on August 10, but not that he was an accomplice to the transaction.

To convict Potts of leading organized crime, the jury had to find that he organized, managed, directed, financed or supervised three or more persons: J.H., Llanes, and Velasquez. Furthermore, Potts must have "acted with the intent to engage in a pattern of criminal profiteering activity" in the State of Washington. CP at 1397 (Instr. 10). The State was required to prove beyond a reasonable doubt that Potts was the leader, not just a member. And, the jurors had to agree that "the same three acts of criminal profiteering constituting a pattern of criminal profiteering activity have been proved beyond a reasonable doubt." CP at 1397 (Instr. 10).

Sufficient evidence existed for a jury to find the elements of the crime beyond a reasonable doubt. Potts met with Llanes, introduced her to drug buying clients, told her what to charge people for the drug, planned ahead of time for Llanes and Velasquez to come from California to Washington, and established a house for Llanes and Velasquez. According to J.H., Potts told him that he "was getting out of it, that he was getting out of the business, that he was—some other people were going to take over, do his business for him." 10C RP at 2262-63. The jury heard the recording where Potts said to J.H. that he had to get the people coming from California money to rent a house when they arrived. Llanes testified that when she arrived, "A friend of [Potts's] loaned *us* a room," and then Potts rented a house with his friend. 10B RP at 2218 (emphasis added). The house was for Llanes to stay in "and for the person who was going to come and stay, and work." 10B RP at 2218. Llanes testified that the person that was going to stay was Velasquez.

Velasquez had been in town two or three days when he and Llanes met up with J.H. in the Burger King parking lot. J.H. testified that he asked Llanes, while in the car with Llanes and Velasquez, if the money on August 10 was going to Potts, and she said yes. Both Llanes and Velasquez were pulled over a short distance away from the meeting, and officers found 247 grams of methamphetamine and a considerable amount of money in the car. Officers also found a pay/owe sheet, or ledger book.

The testimony at trial was sufficient for the jury to find Potts organized, managed, directed, financed, or supervised Velasquez. In closing argument, the State contended that Potts was "[j]ust about to get away and insulate himself from doing hand-to-hand transactions. . . He had people coming in to do that for him. But he got scooped up, and now we're here." 11B RP at 2586. The evidence described above supports the State's argument. The jury found Potts guilty under each alternative means. The jury also found Potts guilty of each predicate offense and the aggravator

associated for a major violation of the UCSA. We conclude that, when viewing the evidence in the light most favorable to the State, sufficient evidence exists to support the conviction.

## V. PROSECUTORIAL MISCONDUCT

Potts argues that the prosecutor committed misconduct when he equated speculation with circumstantial evidence, incorrectly arguing the law. He argues the prosecutor shifted the burden of proof. Potts also argues that the trial court improperly overruled his objection to this argument. He contends that there is a substantial likelihood that the misconduct affected the verdict on the leading organized crime count, the delivery of a controlled substance on August 10 count, and the possession with intent to deliver a controlled substance on August 10 count. Potts asserts the same general contention in his SAG. We disagree.

### A. Standard of Review

The defendant bears the burden of proving that a prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The threshold question is whether the prosecutor's arguments were improper. *Thorgerson*, 172 Wn.2d at 442.

Once a defendant establishes that a prosecutor's statements were improper, we determine whether the defendant was prejudiced under one of two standards of review. *Emery*, 174 Wn.2d at 760. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). We review the prosecutor's comments during closing argument in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011).

B.       Closing Argument

During the State's rebuttal closing argument, the prosecutor responded to Potts's argument that the connection between Velasquez and himself was "pure speculation." 11B RP 2624. The prosecutor said, "There's another word for speculation, and the word is circumstantial." 11B RP 2627. The statement standing alone is clearly a misstatement of the law. Speculation is not the same as circumstantial evidence. Potts objected to the misstatement, and the court told the jury to read the instructions. The prosecutor then immediately focused on the evidence and the reasonable inferences therefrom. The State said, "And don't take my word for it; there is a jury instruction." 11B RP at 2627. The prosecutor then read the jury the definition of circumstantial evidence.

Because the prosecutor misstated the law and Potts objected, Potts must show that the improper statement resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Anderson*, 153 Wn. App. at 427. In the context of the entire argument, the issues as a whole, the evidence in the trial, and the jury instructions, there is not a substantial likelihood that the statement impacted the jury's verdict.

After Potts objected, the court and the prosecutor referred the jury to the instructions, and the prosecutor immediately focused his argument on circumstantial evidence. The prosecutor pointed out statements Potts made, which were recorded, and emphasized the language Potts used such as "me" rather than "them." 11B RP at 2632. The prosecutor made it clear that his argument was that Potts was not retiring entirely but was no going to be participating in the day-to-day sales.

Potts's argument about speculation was specific to the incidents of August 10. Throughout the trial there was overwhelming direct and circumstantial evidence to prove Potts's relationship to Llanes, J.H., and Velasquez. We conclude that the improper statement did not prejudice Potts's trial, and Potts has failed to establish his prosecutorial misconduct claim.

## VI.    JURY INSTRUCTION

Potts argues that the trial court improperly instructed the jury on leading organized crime, and violated his due process rights.  We disagree.

### A.    Standard of Review

We review jury instructions for errors of law de novo and consider the challenged instructions in the context of all of the jury instructions.  *State v. Hayward*, 152 Wn. App. 632, 641-42, 217 P.3d 354 (2009).  "Jury instructions, *taken in their entirety,* must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt."  *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995) (emphasis added).  "Specifically, the 'to convict [jury] instruction must contain all of the elements of the crime because it serves as a yardstick by which the jury measures the evidence to determine guilt or innocence.'"  *State v. Johnson*, 180 Wn.2d 295, 306, 325 P.3d 135 (2014) (quoting *State v. Sibert*, 168 Wn.2d 306, 311, 230 P.3d 142 (2010) (alteration in original) (internal quotation marks omitted)).

"'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and *when read as a whole* properly inform the trier of fact of the applicable law.'"  *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (emphasis added) (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)).  We will not reverse, even if an instruction may be misleading, unless the complaining party shows prejudice.  *State v. Aguirre*, 168 Wn.2d 350, 364, 229 P.3d 669 (2010).  If a jury instruction correctly states the law, we will not disturb the trial court's decision to give the instruction absent an abuse of discretion.  *Aguirre*, 168 Wn.2d at 364.

B. Leading Organized Crime

Potts argues that the "to convict" instruction for leading organized crime erroneously made it seem as though he could be convicted of leading organized crime as an accomplice. He contends the instruction did not make the burden on the State apparent, and that he offered instructions that would have clarified the standard. He also asserts that the accomplice liability instruction for the possession with intent to deliver count further confused the jury. We disagree.[19]

The "to convict" instruction the trial court gave to the jury stated that the State must have proved beyond a reasonable doubt that Potts intentionally organized, managed, directed, financed, or supervised, J.H., Llanes and Velasquez, with intent to engage in a pattern of criminal profiteering, in the state of Washington. *State v. Davis*, 93 Wn. App. 648, 970 P.2d 336 (1999). It also stated that the State must prove Potts was "the leader of a criminal profiteering organization, not just a member." CP at 1397 (Instr. 10). The instruction contained all of the elements of the crime and informed the jury of the State's burden of proof.

Potts's proposed instruction contained the same information but included the following sentence as an element of the crime: "[T]he defendant was the leader of a criminal profiteering organization, not just a member." CP at 1374. The instruction also included, "A person cannot be convicted of the crime of Leading Organized Crime as an accomplice." CP at 1374. Additionally, Potts proposed an instruction that stated, "Accomplice liability does not apply to the crime of Leading Organized Crime." CP at 1367.

The court's jury instruction accurately articulated the State's burden of proof and made it clear that Potts could not simply be a member of a criminal profiteering organization, but had to

---

[19] Potts argues that the instruction was constitutional error and therefore, presumed prejudicial. Because we do not find error, we do not reach this contention.

be the leader. The trial court did not abuse its discretion by determining that Potts's proposed additional language was not necessary to properly convey the law to the jury. In addition, the court's instruction on accomplice liability specified it applied to "the commission of delivery of a controlled substance or possession of a controlled substance with the intent to deliver." CP 1405 (Instr. 18). The State did not argue that accomplice liability applied to the leading organized crime charge. It solely argued that accomplice liability applied to the August 10 delivery of methamphetamine count.[20]

The "to convict" instruction was accurate. It accurately presented the elements. It clearly stated the State's burden. Furthermore, Potts does not show prejudice and we presume that a jury follows the trial court's instructions. *State v. McDaniel*, 155 Wn. App. 829, 861, 230 P.3d 245 (2010). We hold that the jury instruction was not misleading and the trial court did not err.

VII.    PRIVACY ACT, CHAPTER 9.73 RCW

Potts argues that the trial court erred by denying his request to suppress evidence from the intercepted recordings. We disagree.

A.    STANDARD OF REVIEW

Washington's privacy act generally prohibits intercepting and recording any private communications. RCW 9.73.030; *State v. Jimenez*, 128 Wn.2d 720, 723, 911 P.2d 1337 (1996). The privacy act includes an exclusionary rule which provides that "[a]ny information obtained in

---

[20] In his SAG, Potts also argues that the trial court erred when it declined to include the sentence, "Accomplice liability does not apply to the Crime of Leading Organized Crime," in the "to convict" jury instruction for leading organized crime. SAG at 43. Potts contends that the court in *State v. Hayes*, 177 Wn. App. 801, 312 P.3d 784 (2013), held that accomplice liability cannot be the theory of one of the predicate crimes. Potts is mistaken. In *Hayes*, we did not vacate the conviction for leading organized crime based on accomplice liability, we vacated an enhancement. 177 Wn. App. at 811. *Hayes* addresses the application of enhancement statutes to accomplice liability, not the application of accomplice liability to the predicate offenses for leading organized crime. 177 Wn. App. at 811. We again hold that the instruction was proper.

violation of RCW 9.73.030" is inadmissible. RCW 9.73.050; *Jimenez*, 128 Wn.2d at 723. Where law enforcement officers make a genuine effort to comply with the privacy act and intercept a private conversation pursuant to an RCW 9.73.230 authorization, the admissibility of any information obtained is governed by the specific provisions of RCW 9.73.230(8). *Jimenez*, 128 Wn.2d at 722.

Absent compliance with that section, the intercepted or recorded communication is inadmissible. RCW 9.73.230(8). However, there is a provision in the statute that precludes the suppression of other evidence not tainted by the statutory violation. It states, "Nothing in this subsection bars the admission of testimony of a party or eyewitness to the intercepted, transmitted, or recorded conversation or communication when that testimony is unaided by information obtained solely by violation of RCW 9.73.030." RCW 9.73.230(8).

Statutory construction is a question of law we review de novo. *State v. Forest*, 85 Wn. App. 62, 65, 930 P.2d 941 (1997). The primary objective of statutory construction is to carry out the intent of the legislature by examining the language of the statute and unless a contrary intent appears, we give words their plain meaning. *Forest*, 85 Wn. App. at 65. We have held that the Legislature did not intend to limit agency authorizations to one conversation per authorization. *Forest*, 85 Wn. App. at 69. That "limitation would lead to absurd results, in contravention of a cardinal principle of statutory construction." *Forest*, 85 Wn. App. at 69. If we find that evidence was improperly admitted, we then ask whether, within reasonable probabilities, the outcome of the trial would have been materially affected if the error had not occurred. *State v. Braham*, 67 Wn. App. 930, 939, 841 P.2d 785 (1992).

B.      Recordings

Potts argues that the trial court erred by denying his motion to suppress "any and all" evidence derived from Captain Huhta's intercept authorizations. Br. of Appellant at 54. He contends that the police did not meet the requirements of RCW 9.73.230. However, the statutory language does not support Potts's argument.

RCW 9.73.230(1) provides that the chief law enforcement officer of a law enforcement agency may authorize the interception, transmission, or recording of a conversation or communication by officers when at least one party to the conversation has consented, probable cause exists to believe it involves a violation under chapter 69.50 RCW, and a written report is completed. The written report must be prepared and signed by the chief officer and include, the circumstances, the names of the authorizing and consenting parties, the names of the officers authorized to intercept, the name of the targeted individual, the details of the alleged offense, and whether there was an attempt to authorize under RCW 9.73.090(2). RCW 9.73.230(2). Section 8 provides that evidence is admissible if the requirements of section 1 have been met and the intercept or recording is admitted in a prosecution under chapter 69.50 RCW. RCW 9.73.230(8). Section 6 states,

> Within fifteen days after the signing of an authorization that results in any interception, transmission, or recording of a conversation or communication pursuant to this section, the law enforcement agency which made the interception, transmission, or recording shall submit a report including the original authorization under subsection (2) of this section to a judge of a court having jurisdiction which report shall identify (a) the persons, including the consenting party, who participated in the conversation, and (b) the date, location, and approximate time of the conversation.

RCW 9.73.230(6). Section 7 of the statute requires the court to make an ex parte review of the authorization within two judicial days of receipt. RCW 9.73.230(7).

41

Potts argues that the trial court failed to address whether the recordings exceeded the scope of the authorization when it denied his motion to suppress. He contends that the authorizations did not specifically permit recording J.H.'s calls. In the authorization, Captain Huhta references the use of a wire or digital recording devices but also includes, "I believe that additional conversation(s) will occur between CI and POTTS . . . in regards to the sale of controlled substances." CP at 591, 595. It is not unusual that a drug transaction would involve more than one contact. *See e.g.*, *State v. Smith*, 85 Wn. App. 381, 390, 932 P.2d 717 (1997) ("The provision of the statute permitting proper authorizations to be valid statewide is sufficient to provide the police the flexibility to deal with the uncertainties that are inherent in drug transactions."). The recordings at issue here, including the initial phone call setting up the transaction, are within the scope of the authorization. The authorization reflected the reality that J.H. would set up a meeting with Potts and exchange money for drugs, and that the interaction might encompass more than one conversation.[21]

Potts also argues that because the State could not provide all the documents relating to the August 10 controlled buy, all evidence from that transaction should have been suppressed. He argues that if the trial court had excluded the additional information obtained there would be insufficient evidence to support the leading organized crime count, the delivery of a controlled substance on August 10 count, and the possession with intent to deliver a controlled substance on

---

[21] In his SAG, Potts also asserts that the holding in *Forest*, 85 Wn. App. 62, should be overturned because it misinterprets the legislature's intent. He contends the legislature intended one intercept per authorization. We disagree. Potts also asserts in his SAG that even if we uphold *Forest*, it supports his position. He attempts to distinguish *Forest*, where the authorization specified two intercepts, with his case where he claims the authorizations were only for one intercept. He is incorrect. Here, the authorization forms completed by Chief Huhta actually do not specify the number of intercepts. The language is, "I believe that additional conversation(s) will occur between CI and POTTS." CP at 591, 595.

August 10 count. The State could produce the authorization for the August 10 controlled-buy intercept but not the disposition sheet. The requirements of section (1) were met and therefore, the evidence was properly admitted through testimony.

Potts further contends that the authorizations did not adequately provide descriptive information. He states that the police did not provide specific information available at the time of the authorization. In *Smith*, one of two authorizations lacked specificity because the police did not state the location where the recording would occur when they had that information. 85 Wn. App. at 386, 388. The *Smith* court reasoned that the police officers had an idea of where the drug transaction would occur but did not include this known information in the authorization; therefore, the authorizations failed to meet the statutory requirement. *Smith*, 85 Wn. App. at 388. The court held that in the second transaction, where the officers did not have more information about the location, a lack of specificity did not violate the statute. *Smith*, 85 Wn. App. at 389.

This case is more akin to the second authorization in *Smith* because here, the authorization contained sufficient specificity. For the first two buys, J.H. and Potts were supposed to meet at the Dairy Queen. However, the officers did not know where the transaction would take place. The controlled buy also involved cars, making it difficult to predict exactly were J.H. and Potts would go. Therefore, the officers provided the information available to them and satisfied statutory requirements.

Potts also argues that the authorizations did not comply with RCW 9.73.230(6) because the disposition reports did not indicate the time and location of each interception, transmission, or recording. However, where there is "substantial compliance" with the reporting requirements,

suppression is not required. *State v. Knight*, 79 Wn. App. 670, 685, 904 P.2d 1159 (1995). The plain language of the statute only requires the court to find that the requirements of subsection (1) are met before admitting this evidence. RCW 9.73.230(8); *State v. Moore*, 70 Wn. App. 667, 674, 855 P.2d 306 (1993).[22]

Potts argues that *Moore* and *Knight* were incorrectly decided because they do not comport with the legislature's intent and that we should not follow them. In *Knight*, the court held that before a person's privacy is invaded, strict compliance should be required; without it, privacy might be invaded improperly and the intent of RCW 9.73.230 defeated. 79 Wn. App. at 685. The court also reasoned that after one's privacy has been invaded, strict compliance is less important. *Knight*, 79 Wn. App. at 685. The privacy already invaded cannot be restored, and the rights of the parties can be sorted out in the ordinary course of litigation. *Knight*, 79 Wn. App. at 685. Based on these observations, the court held that noncompliance with a post-invasion statutory requirement should warrant reversal only if the State fails to show substantial compliance, or the defendant shows prejudice due to the absence of strict compliance. [23] *Knight*, 79 Wn. App. at 685; *accord Moore*, 70 Wn. App. at 675 (taped recordings in compliance with RCW 9.73.230(1) are

---

[22] Potts also asserts that the recordings made under RCW 9.73.230 should not have been admitted to prove count one because leading organized crime is not one of the delineated offenses for which RCW 9.73.230 provides. Potts did not make this argument below. The issue is not of constitutional magnitude and therefore cannot be heard for the first time on appeal. We need not consider the argument. RAP 2.5(a). We do note that we have found no authority that a recording should be suppressed because, in addition to the crime for which it was authorized, the recording was also used to support a different crime.

[23] This interpretation is in accord with general search and seizure law. "Absent constitutional considerations, the rules for execution and return of a warrant are essentially ministerial in nature." *State v. Kern*, 81 Wn. App. 308, 311, 914 P.2d 114 (1996); *see e.g.*, *State v. Parker*, 28 Wn. App. 425, 427, 626 P.2d 508 (1981) ("Absent a showing of prejudice to the defendant, procedural noncompliance does not compel invalidation of the warrant or suppression of its fruits."). Procedural noncompliance with these rules does not require suppression of evidence or invalidate a warrant absent a showing of prejudice to the defendant. *Kern*, 81 Wn. App. at 311.

admissible, without proof of compliance with sections (6) and (7)).  We follow the precedent set

in *Moore* and *Knight*, and conclude the intercepts did not violate RCW 9.73.230.

C.       Ineffective Assistance of Counsel

Potts contends that if we cannot review his chapter 9.73 RCW assertions because they were

not argued below, he was deprived of effective assistance of counsel.  We disagree.[24]

To demonstrate ineffective assistance of counsel, a defendant must make two showings:

(1) that defense counsel's representation was deficient, i.e., it fell below an objective standard of

reasonableness based on consideration of all the circumstances; and (2) that defense counsel's

deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except

for counsel's unprofessional errors, the result of the proceeding would have been different.  *State*

*v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

Potts cannot show that his counsel's representation was deficient, much less show that the

outcome of his trial would have been different.  Potts's counsel made several arguments to suppress

evidence for chapter 9.73 RCW violations.  Potts must overcome "a strong presumption" that his

counsel was effective.  *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).  His counsel's

performance is reviewed in context of the entire record, not whether or not he made every

conceivable argument under a specific statute.  Potts's ineffective assistance of counsel claim fails.

VIII.    VALIDITY OF THE SEARCH WARRANT

Potts argues that the trial court erroneously denied his motions to suppress evidence seized

under a search warrant.  He contends that the search warrant did not authorize a search of two of

---

[24] Potts also argues that if any of his arguments under chapter 9.73 RCW are not preserved, we should still consider them because the legislature intended it to be so, and we have discretion to review any issue argued for the first time on appeal, including issues that do not implicate a constitutional right.  We disagree with Potts's legal argument and decline to exercise our discretion to review the issues he raises for the first time on appeal.

the three locations because they lacked probable cause. He also argues that the search warrant was unconstitutionally overbroad because it authorized the seizure of items protected by the First Amendment to the United States Constitution. We agree in part and disagree in part.

A. Standard of Review

Generally, we review the issuance of a search warrant for abuse of discretion. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). However, we review the denial of a suppression motion, to determine whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Evidence is substantial when it is enough "to persuade a fair-minded person of the truth of the stated premise." *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999). We review conclusions of law from an order pertaining to the suppression of evidence de novo. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). In reviewing a probable cause determination, we review the same evidence presented below. *State v. Chamberlin*, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007).

Affidavits for search warrants must establish probable cause. *State v. Grenning*, 142 Wn. App. 518, 534, 174 P.3d 706 (2008) *aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010). Affidavits are to be interpreted "'in a commonsense manner, rather than hypertechnically, and any doubts are resolved in favor of the warrant.'" *State v. Lyons*, 174 Wn.2d 354, 360, 275 P.3d 314 (2012) (quoting *State v. Jackson*, 150 Wn.2d 251, 265, 76 P.3d 217 (2003)). Even so, we must enforce that the magistrate judge serves as more than a "'rubber stamp for the police.'" *Lyons*, 174 Wn.2d at 360 (quoting *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964)).

We review whether a warrant meets the particularity requirement of the Fourth Amendment to the United States Constitution de novo. *State v. Reep*, 161 Wn.2d 808, 813, 167

P.3d 1156 (2007). "The Fourth Amendment mandates that warrants describe with particularity the things to be seized." *State v. Riley*, 121 Wn.2d 22, 28, 846 P.2d 1365 (1993).

With most search warrants, a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit it to be. *State v. Perrone*, 119 Wn.2d 538, 547, 834 P.2d 611 (1992). However, where a search warrant authorizes a search for materials protected by the First Amendment, the degree of particularity demanded is greater than in the case where the materials sought are not protected by the First Amendment. *Perrone*, 119 Wn.2d at 547.

B.      Motion to Suppress

Potts argues that the issuing magistrate only found probable cause to search one out of the three properties in the affidavit, and signed only one document, but the police copied the warrant and used it to search all three locations.[25] This is the same argument Potts made to the trial court that was denied. At trial, the State did not introduce any evidence obtained from the search of the two locations not named in the search warrants. Additionally, we affirm Potts's convictions on all other grounds and do not remand to the trial court. Therefore, Potts cannot establish any prejudice, making any error we might find harmless. *See State v. Barry*, 183 Wn.2d 297, 317, 352 P.3d 161 (2015) (quoting *State v. White*, 72 Wn.2d 530, 530-31, 433 P.2d 682 (1967) ("[E]rror without prejudice is not reversible, 'specifically' error which does not substantially affect the merits of the controversy likewise is not grounds for reversal."). We will therefore limit our review of these issues.

We conclude that the warrant only authorized a search of Potts Family Motors, not of the other two locations. We also conclude that the trial court properly denied Potts's motion to

---

[25] Potts also argues that the warrant did not authorize the police to search for or seize tools but that his tools were seized. The State concedes this issue.

47

suppress evidence from Potts Family Motors because there was probable cause. Therefore, reviewing the affidavit in a commonsense manner and resolving doubts in favor of the warrant, we hold that the trial court erred in part by denying the motion to suppress and the motion to reconsider for the two other properties. However, any error was harmless because no evidence from the locations was admitted at trial.[26]

### C. Overbreadth

The warrant authorized the seizure of specific categories of items related to the possession or distribution of controlled substances. The categories were: controlled substances; paraphernalia for distribution; personal books or papers; books or records; cash and currency; and identifying personal property. These items were specifically tailored to recover evidence related to Potts's possession and distribution of methamphetamine. They were not unbridled.

A heightened standard of particularity exists when the items seized are books, and the basis for their seizure involves the ideas the books contain. *Perrone*, 119 Wn.2d at 547. But here, that is not the case. In Potts's case, the personal books, as well as books and records categories specified in the warrant all related to possessing, processing, or distributing controlled substances, and leading organized crime. Ledgers of illegal activity are not protected by the First Amendment, and the list of items to be seized was limited in scope. Hence, the warrant was not overbroad.

## IX. EXCEPTIONAL SENTENCE

Potts argues that the trial court erred when it imposed an exceptional sentence on his leading organized crime conviction. Specifically, he contends that the aggravating factor under RCW 9.94A.535 may not be applied to a sentence for leading organized crime. The trial court

---

[26] Because of our resolution of this issue, we do not address the several other arguments Potts makes about probable cause.

found that the aggravating factor could be applied to leading organized crime. We agree with the trial court.

Potts argues that because leading organized crime is not a violation of the UCSA, the aggravating factors the jury relied on do not apply. Potts does not contest the court's reasoning or the excessiveness of the sentence, only that the exceptional sentence was not authorized by the statute. We review questions of statutory interpretation de novo, interpreting statutes to give effect to the legislature's intent. *In re Pers. Restraint of Crow*, 187 Wn. App. 414, 422, 349 P.3d 902 (2015).

RCW 9.94A.535(3)(e) states,

The current offense was a major violation of the Uniform Controlled Substances Act, chapter 69.50 RCW (VUCSA), related to trafficking in controlled substances, which was more onerous than the typical offense of its statutory definition: The presence of ANY of the following may identify a current offense as a major VUCSA:

(i) The current offense involved at least three separate transactions in which controlled substances were sold, transferred, or possessed with intent to do so;

(ii) The current offense involved an attempted or actual sale or transfer of controlled substances in quantities substantially larger than for personal use;

(iii) The current offense involved the manufacture of controlled substances for use by other parties;

(iv) The circumstances of the current offense reveal the offender to have occupied a high position in the drug distribution hierarchy;

(v) The current offense involved a high degree of sophistication or planning, occurred over a lengthy period of time, or involved a broad geographic area of disbursement; or

(vi) The offender used his or her position or status to facilitate the commission of the current offense, including positions of trust, confidence or fiduciary responsibility (e.g., pharmacist, physician, or other medical professional).

The plain language of the statute clearly applies to leading organized crime where the predicate offenses are violations of the UCSA. "The Legislature allows for exceptional sentences when major violations of the [UCSA] that are more onerous than typical violations are present, as

defined by a list of non-exclusive factors." *State v. Hrycenko*, 85 Wn. App. 543, 547, 933 P.2d 435 (1997). The predicate offenses for Potts's leading organized crime conviction were delivery and possession with intent to deliver methamphetamine, and the facts included at least three separate transactions, a very large amount of methamphetamine, and Potts's orchestration of the transactions.

The statute does not require that the current offense was codified under chapter 69.50 RCW, only that the current offense was a major violation of chapter 69.50 RCW. Potts's leading organized crime conviction fits within this category. The trial court did not err when it imposed the exceptional sentence. We uphold the exceptional sentence.

## X. STATEMENT OF ADDITIONAL GROUNDS

In addition to the issues already addressed above, Potts filed a SAG in which he asserts the following new contentions: that the trial court erred by denying his May 7, 2013 motion for return of property; that the trial court erred by not ordering the return of his Red Canoe account; that the officers of the court in bad faith, deliberately and collectively, denied him his due process, effective assistance of counsel, and fair trial rights; that Judge Warning and the prosecutor had improper ex parte communication that violated his right to due process, effective assistance of counsel, and a fair trial; that the prosecutor committed misconduct in closing argument; that the trial court did not properly respond to a question from the jury; that there was insufficient evidence to prove the leading organized crime charge; and, that the prosecution did not properly establish a bus stop for the aggravator to apply.

A.      Motion for Return of Property

Potts argues that the trial court erroneously denied his motion to return property on May 7, 2013.[27]  In the motion, Potts argued that the issuing judge for the search warrants did not find probable cause for his home address and that the execution of the search warrants was improper. He argues now that the trial court cannot review a finding of probable cause that was never made.

The trial court did not enter a written order following its oral ruling.  However, approximately a year later, the trial court entered findings of fact and conclusions of law addressing the return of Potts's property.  The order stated that the property was being held pending the outcome of this appeal.  The court denied the return of evidence that would still be relevant if Potts was retried, and denied the return of other evidence that was not Potts's personal property.  Both because Potts will not be retried and because we conclude above that the search warrant for Potts's home was invalid, we conclude the property seized from Potts's home should be returned to its rightful owner(s).

B.      The Red Canoe Account

Potts argues that the trial court found that his Red Canoe account was illegally seized and then erroneously did not order its return.  We disagree.

On May 14, 2013, the trial court heard argument on Potts's March 5, 2013 motion to return the Red Canoe account.  The trial court ruled that, for reasons other than what Potts argued, it was granting the motion to suppress and granting return of the account.  However, the trial court stated it understood there was a parallel forfeiture proceeding and specified that its ruling did not free the accounts from this proceeding.  The trial court did order return of the account, pending the

---

[27] May 14 appears to be the day Potts intended to address in this SAG issue because it was on this day that he raised his displeasure with his prior counsel and contested the probable cause finding on all locations.

forfeiture proceeding. Approximately a year later, the trial court entered a written order ordering the return of Potts's "personal and business bank accounts which were frozen as a result of the charges herein." CP at 1569. The order also stated, "This order does not apply to any specific funds which were previously ordered to be forfeited in separate proceedings." CP at 1569.

The forfeiture proceeding is a separate proceeding from the criminal proceeding. RCW 69.50.505.[28] Additionally, the record does not contain information about the forfeiture proceeding, and Potts does not provide information to show the account was not held under RCW 69.50.505. Based on the record available to us, the trial court did not err by authorizing the return of Potts's property pending the forfeiture proceeding.

C.      No Improper Conduct of the Court, State, and Defense Counsel

Potts argues that he witnessed "improper interplay between the [S]tate, the court and defense counsel." SAG at 22. He asserts that the collective conduct was a violation of the Code of Professional Conduct, CrR 4.5(d), and the Code of Judicial Conduct. Potts asks that we enter a finding that the officers of the Cowlitz County Superior Court acted in bad faith to deprive him of a fair trial.

First, several instances that Potts cites relate to his displeasure with his assigned counsel at the time, who was not his attorney at trial. Consistently throughout the trial, Potts wanted to file his own motions and make his own objects. However, "there is no Sixth Amendment right to 'hybrid representation' through which defendants may serve as cocounsel with their attorneys." *State v. DeWeese*, 117 Wn.2d 369, 379, 816 P.2d 1 (1991) (quoting *State v. Bebb*, 108 Wn.2d 515, 524, 740 P.2d 829 (1987)). Therefore, to the extent that Potts argues he was deprived of a fair trial

---

[28] Potts is not wrong to cite *Deeter v. Smith*, 106 Wn.2d 376, 378, 721 P.2d 519 (1986), for the principle that the Fourth Amendment Exclusionary Rule applies to forfeiture proceedings; however, he misunderstands that although the proceedings are parallel, they are separate.

because the court cut him off or deferred to his attorney, we disagree with Potts. Additionally, to the extent that Potts believes the conduct was an ethics violation, he must bring this complaint before the Washington State Bar Association, not this court.

Second, to the extent that Potts is making an ineffective assistance of counsel claim, we disagree with Potts. To prevail, Potts must show that (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) that defense counsel's deficient representation prejudiced the him, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 334-35. Potts does not satisfy either in his argument.

Competency of counsel is determined based on the entire record below and courts engage in a strong presumption that counsel's representation was effective. *State v. Brett*, 126 Wn.2d 136, 198, 892 P.2d 29 (1995). Trial strategy and tactics do not establish deficient performance. *Kyllo*, 166 Wn.2d at 863. Potts provides quotes that indicate less than polite communication but he does not show the impact on his case. The attorney representing him at the time was not his counsel for trial. And, Potts does not provide any examples of how the decisions made by his trial counsel negatively impacted his trial. Furthermore, Potts has not shown that his attorney's conduct was not trial strategy or tactics. We conclude that Potts did not meet his burden to show ineffective assistance of counsel.

Finally, to the extent that Potts argues that his due process rights have been violated outside of the above analysis, we do not consider the issue because his argument is too vague to conduct a reasonable review. RAP 10.10(c).

D.      Improper Ex Parte Communication

Potts asserts that a trial court judge and a prosecutor on his case engaged in ex parte communication, violating his right to a fair trial.  We disagree

Potts asserts that the fact that he cannot find evidence of Judge Warning and the prosecutor's communication on the record, shows that it was ex parte communication.  We have previously enforced that "'[i]f a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition, which may be filed concurrently with the direct appeal.'"  *State v. Burke*, 132 Wn. App. 415, 419, 132 P.3d 1095 (2006) (quoting *McFarland*, 127 Wn.2d at 335).  Therefore, we decline to consider this issue.

E.      Prosecutorial Misconduct in Closing Argument

Potts also asserts in his SAG that the prosecutor misstated facts during closing argument.  Potts asserts that the prosecutor made a misstatement when he said, "Mr. Potts or one of his associates took the other two pounds into the auto shop." SAG at 36.

At the sentencing hearing, Potts made a motion to arrest judgment for the same reason.  In that motion, he argued that the prosecutor misstated facts during his closing argument.  Potts asserted that there was no testimony that Potts provided Llanes with the additional two pounds of methamphetamine from his dealership.  Potts argued that the prosecutor misstated this fact in closing and thus, committed prosecutorial misconduct.  Potts did not object to the statement during the State's closing argument.

The statements do not appear to be a misstatement of the facts.  Llanes testified that when she got to Washington she got a hotel room and called Potts.  Potts picked her up and took her to his car dealership to take the drugs out of the car.  She stated that "They put it in a garage, the car.

And they took out two pounds." 10B RP at 2211. Llanes testified that Potts gave her two pounds of methamphetamine, instructed her to cut it into ounces, and to go to the hotel and have the drugs ready. The prosecutor did not misrepresent this testimony.

Potts also asserts that the prosecutor improperly said that Llanes went back to Potts for more drugs. However, Potts only provides a partial quote. The full quote is: "And Mr. Potts was the one who set her on her way. Mr. Potts was the one who managed the drugs, right? So she came in and she brought that four pounds, and Mr. Potts told her, 'You package it like this, package it like this.' She told you she had to go back and get the other two pounds after she—she got rid of that first two pounds, so she's continuing to go back to Potts for drugs." 11B RP at 2596.

During direct examination, the prosecutor asked Llanes what happened to the other two pounds, and she said "One of Sidney's friends took it out." 10B RP at 2217. The prosecutor asked if that was the last she saw of it and she said, "No, I also made—I also made them into little balls." 10B RP at 2217. Here also, the prosecutor does not appear to have misstated Llanes's testimony. Thus, the prosecutor's statements were not improper.

F.     Jury Question

Potts asserts that the trial court committed reversible err as to the leading organized crime count when it responded to a jury question. He reasserts his position that the jury should have been instructed that Potts must have "personally" directed the three individuals. SAG at 41. We disagree.

During deliberation, the jury sent out a question: "For Count 1, Element 1C, does the word 'direct' require one-on-one interaction or can it be through an intermediary?" 11B RP at 2651. The prosecutor wanted to direct the jury back to the instructions, whereas the defense wanted to tell the jury that direction cannot be done through an intermediary. After hearing both parties'

positions, the trial court sent a response saying, "Please review the entirety of jury instructions and continue deliberating." 11B RP at 2655. The court noted Potts's objection.

CrR 6.15(f)(1) states that when the jury asks a question, "[t]he court shall notify the parties of the contents of the questions and provide them an opportunity to comment upon an appropriate response." The court gives additional instruction on any point of law in response to jury questions during deliberations in writing. CrR 6.15(f)(1). The trial court abuses its discretion to give additional instructions to the jury only when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Wilson*, 144 Wn. App. 166, 183, 181 P.3d 887 (2008). It is within the trial court's discretion whether to give supplemental instructions to the jury as long as those instructions "do not go beyond matters that had been, or could have been, argued to the jury." *State v. Calvin*, 176 Wn. App. 1, 23, 302 P.3d 509 (2013).

Potts contends that the response misled the jury because the jury instruction on leading organized crime was improper. The adequacy of the jury instruction on leading organized crime is addressed above. We conclude the instruction was proper, therefore the response to the jury instruction was also proper. The trial court did not alter the instructions, it simply referred the jury to the instructions. The trial court did not abuse its discretion.

G.      Insufficient Evidence—Leading Organized Crime

Potts asserts that he cannot be convicted of leading organized crime when one of the individuals he lead, organized, directed, managed, financed, or supervised was a state agent, namely J.H.. He contends that J.H. could not work for him while he was under contract with the state. We disagree.

To support his position, Potts quotes a statement by the prosecutor in which the prosecutor said J.H. was acting as a state agent and therefore could not be an accomplice. This statement does

56

not relieve Potts of his own culpability. *See* RCW 9A.28.040(2)(f) (it is not a defense to criminal conspiracy that the person with whom the accused conspires is a law enforcement agent or other government agent).

Furthermore, the elements of leading organized crime do not place any demands on the individuals who are led, organized, directed, managed, financed, or supervised. RCW 9A.82.060. The leader must have the intent to rally these individuals together in order to engage in a pattern of criminal profiteering. RCW 9A.82.060. J.H.'s title as a state agent is contested in the record; however, his status ultimately does not impact Potts's conviction. Therefore, we affirm the trial court.

H.      Bus Stop Enhancement

Finally, Potts argues that the school bus route stop enhancement should not apply because the stop was not properly designated a school bus route stop. We disagree.

The State successfully sought an enhancement on count II, delivering a controlled substance within one thousand feet of a school bus route stop. RCW 69.50.435(1)(c).[29] During discussions over jury instructions and the counts, defense counsel argued that the bus stop, 3165 Michigan Street, was not properly designated as a school bus stop. Potts argued that the statutory language requires the stop be specifically designated by the Office of the Superintendent.

Rick Lecker, an employee at the Longview School District who is responsible for designating bus stops, testified at the trial. He provided that the location became a stop in 2008, and that it is not listed on the public website as a stop but anyone who called would be told. He also testified that only one child rides from the stop and the child is a special needs student. Ruth

---

[29] The enhancements for counts III, V, and VI were dismissed either voluntarily by the State or by motion through the trial court.

Bunch Manwell, from the Longview School District Geographic Information Systems, testified about mapping software. The State admitted a map of the area where J.H. met Potts by the Dairy Queen, and Manwell indicated on the map where there was a red circle that showed the one thousand foot area around the bus stop.

Based on a plain reading of the statute, Potts's argument is unsupported. It appears that he misapplied a modifier to all of the items in the list that grammatically was intended for only one item in a list. The list is recurring throughout the statute and it is therefore clear that "local governing authority," was not intended to apply to the designation of a bus stop. RCW 69.50.435. We conclude that Potts's argument is unsupported by the statute.

Potts cites two cases that held the school bus stop enhancement was proper. *See State v. Nunez-Martinez*, 90 Wn. App. 250, 951 P.2d 823 (1998); *State v. Davis*, 93 Wn. App. 648, 970 P.2d 336 (1999). However, these cases do not prove his point, they simply provide examples where a school provided the location of its stops to the local government authority and the court found the enhancement was applied properly. *Nunez-Martinez*, 90 Wn. App.at 256; *Davis*, 93 Wn. App. at 653. Neither court commented on the need to have the Office of the Superintendent of Public Institutions specifically designate school bus stops. In fact, in *Davis,* we held that "[t]he location of school bus stops can be learned by 'observing the gathering of schoolchildren waiting for their school buses, or contacting local schools or the director of transportation for the school district.'" 93 Wn. App. at 653 (quoting *State v. Coria*, 120 Wn.2d 156, 167, 839 P.2d 890 (1992)). We affirm the sentencing enhancement.

We affirm Potts's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Johanson, J.

Maxa, A.C.J.